RONALD, APPELLEE, *v.* YOUNG, ADMR., BUREAU OF WORKMEN'S COMPENSATION; THE WARNER & SWASEY CO., APPELLANT.

(No. 25970—Decided January 10, 1963.)

Mr. *Gilbert Weil*, for appellee.

Mr. *Mark McElroy*, attorney general, for James L. Young, Administrator, Bureau of Workmen's Compensation.

Messrs. *Jones, Day, Cockley & Reavis*, for appellant.

SKEEL, J. This appeal comes to this court on questions of law from a judgment entered on the verdict of a jury finding "that the plaintiff is entitled to participate in the workmen's compensation fund of the state of Ohio."

The defendant-appellant, The Warner & Swasey Company, was plaintiff-appellee's employer and is a self-insurer under the provisions of Section 4123.35, Revised Code, a part of the Workmen's Compensation Act. When demand for compensation was made by the claimant and refused for the reason that his employer determined that he had not been injured in the course of his employment, the claimant filed an "application for adjustment of claim." This paper was dated November 2, 1956, and stamped "Received—22 Nov. 5, 1956 Bureau of Workmen's Compensation." The figures "22" indicate that it was a claim filed by an employee of a self-insurer. The record shows that upon hearing the administrator allowed the claim, which decision was affirmed by the Regional Board of Review, and that such decision was appealed to the Industrial Commission, where, upon hearing, the claim was disallowed. The final order thus entered by the Industrial Commission was appealed to the Court of Common Pleas of Cuyahoga County where, as indicated, a jury verdict was returned for the plaintiff, appellee herein. The defendant Administrator of the Bureau of Workmen's Compensation, a co-defendant in the trial court, who is subject under the Act to the judgment entered, did not join in the appeal by the employer and is, therefore, not before this court in this appeal.

The plaintiff contends that, about two months after he was employed by this defendant-appellant as a lathe operator, he was injured while attempting to lift "(by hand)" an eighty-four pound casting from a skid, in which such casting had been delivered to the lathe which he was then operating, to the top of the side of the skid toward the lathe, intending to then place the casting upon the bed of the lathe and into the jaws of the chuck of the lathe preparatory to machining the casting. It is the plaintiff's claim that, as he was in the act of lifting the eighty-four pound casting out of the skid, it slipped from his grasp, and in regaining his hold on the casting, after it had fallen four inches, which he accomplished by lunging downward while bent over the side of the skid and in an unbalanced posi-

tion, he felt a "pain in my back. It felt like a piece of cloth tearing. I managed to hold onto the piece and get it up on top of the skid." The plaintiff testified that after feeling the severe pains in his back around the beltline, which became more severe during the shift and thereafter, he continued to work out the shift and two hours overtime without reporting his alleged injuries to anyone nor did he go to the dispensary.

There was available, unless otherwise in use, an overhead crane (two cranes on a single track) to be used to lift heavy pieces into place to be machined on the lathes along the aisle upon which the plaintiff's lathe faced. His instructions were to use a crane where heavy castings were being machined. He explained his failure to wait for the use of a crane on this occasion by saying that he was told by the assistant foreman that the crane would be busy all night. The foreman had no recollection of any such conversation. The plaintiff also stated in other parts of his testimony that it would have cost him time even if the crane were available to wait for or to get the crane and that he was, at the time he attempted to and did load the casting by hand, already behind in his production for the night. There is undisputed testimony, however, that where the use of a crane was necessary "crane time" was allowed and that no penalty was enforced where the required use of a crane slowed down production. The plaintiff testified that at the time of his injury, the pain (which continued and increased without abatement for a long period of time) so limited his movement that he could not stand up to turn off the lathe in time to prevent the necessity of scraping the casting then being machined. However, the company records disclose that no waste was reported as to the production of the plaintiff.

There is confusion in the record as to the date of the alleged injury. The plaintiff testified that he could not get to work the day (or evening) before the alleged accident because of a bad storm. The company record shows that he had called in on July 26, 1956, and states, "If storm clears up, will be in; if not tomorrow. Has a houseful of scared kids." Inasmuch as the alleged accident was said to have happened the night after the storm, the date must have been July 27, 1956, and the last night he reported for work was July 28, 1956.

The plaintiff does not claim to have reported the alleged

injury to his back at the time it happened, either to the assistant foreman or by going to the dispensary, as he had done on two other previous occasions, but instead he completed the shift with two hours overtime and, as he testified, continued to load eighty-four pound castings into his lathe by hand during the balance of the shift and overtime. The next night he returned to work.

Sometime during this shift (July 28, 1956), he reported to his assistant foreman or supervisor that he had a pain in his back. The record shows the following:

"A. I told Mr. Kopplin that I had a terriffic pain in my back and that I didn't think that I could stick the shift out, and that I thought I would go home when the eight hour shift went home.

" * * *

"A. I didn't mention that I had this injury done to me. I just told him I had a terrific pain in my back.

" * * *

"A. He said, 'Well, you should go to the dispensary.' "

The plaintiff did not follow the instructions which he testified he had received from his supervisor. Following this testimony, the witness said:

"Q. What reason was it that you did not tell Mr. Kopplin on the night that you were injured how it happened that you got hurt on the job, why didn't you? A Because I didn't want to jeopardize my job. I was afraid. I had three kids and a wife, and I was on probation."

In explanation of this statement, the witness said:

"A. As long as I was on probation I figured I didn't want to be a burden to the company. They would think that I was a —well, what should I say, one of those guys that gets hurt every time he turns around."

And again, the witness said:

"A. Again I say I didn't want to feel that I was a burden on the company, that is why I decided to go see my own doctor."

The plaintiff did not go to see a doctor until July 30, 1956, when he visited Dr. Knusli because his family doctor (Dr. Silver) was out of the country. The record discloses that the doctor advised him that he was suffering from "sciatic" which would keep him from returning to work for six months. The

plaintiff is said to have responded to this advice by stating that he would be back to work the next Monday.

The plaintiff, after his visit to his doctor (Dr. Knusli), on July 31st visited the dispensary. One company record, designated "absence report," shows the following:

"7/30/56 Backache went to see P.P. (personal physician) wife called. Ret. 7/31/56."

"7/31/56 He was at disp. * * * applied medication—coming in to see Dr. H. Ret?" (Dr. Hamilton was the Company Doctor.)

The "Dispensary Report" entry for July 31, 1956, being in the handwriting of the nurse, and that of August 1, 1956, being in the handwriting of Dr. Hamilton, the latter entry being erroneously excluded by the trial court, are as follows:

"7/31/56—2:30—Came to disp.—did not work yesterday— went to P.P. who told him it was Sciatica—was given medication and injection in hip. This A. M. much worse. Will see Dr. H. 8/1/56."

"8/1/56—History of pain in lower back and right hip and right leg—3 or 4 months prior to employment. Pain has been getting worse. Pain has characteristics of nerve root pressure. *No shop injury*. Wants to know name of specialist—suggested Murphy or Alfred."

Dr. Ezra I. Silver, the plaintiff's personal doctor, testified that a ruptured disk (in the spine) is caused by trauma and that, in taking the history of such a case, the cause of the disability would be noted. No such record of Dr. Silver was presented or found in his records, it being stated that he might have put it on a "blue form" mailed to the Bureau of Workmen's Compensation, but such form was not produced, either from his doctor's file or from the files of the commission. There is no credible evidence in the record (other than the plaintiff's alleged statements to Dr. Hamilton on his first visit when he said he did not go into great detail) that the plaintiff reported an injury to his back in lifting a casting out of a skid, either to the defendant-appellant or to the doctors he visited at or near the time the injury was alleged to have happened (July 27, 1956), or that the notice of claim was given until about the time the claim was filed with the Bureau of Workmen's Compensation on November 5, 1956.

One other part of the record should be noted before considering the assignments of error, and that concerns the physical possibility of placing an eighty-four pound casting into the lathe without the aid of a crane. The plaintiff, in explaining how he put the eighty-four pound castings into the lathe, said:

"A. I would reach down here and pick it up off the top of that skid, put it up on the cross glide of the machine where I could shift the weight of it, hold it, I would reach over, using my knees as a leverage against the splash pan on the machine, put it in with two hands into the chuck, and I would get it centered up against my back stocks, and then hold it there with one hand and close the chuck jaws with the other.

"'* * *

"A. From the edge of the skid I took it and rested it up on the cross glide.

"Q. The cross glide is this part right in here? A. Yes, sir, that is this part right here.

"Q. Where? A. Right here.

"Mr. Calhoun: Let the record show that he is indicating the part behind the top wheel at the left of the photograph.

"Q. And you put it up on here, that is the cross glide? A. Yes, sir.

"Q. Then what would you do? A. Shift my weight so I could get it up there.

"Q. How would you shift your weight, from where to where? A From picking it up in a downard position, I would lay it up there, tip it upon edge, and get under it so I could hold it out there and put it in the chuck.

"Q. Bracing you knees up against the splash guard? A. Yes.

"Q. What did it take to put it into the chuck? How would you fasten it to the chuck? A. Well, you wouldn't hold it out there.

"Q. How would you get it into the chuck? A. Well, the chuck is open, you have maybe a half inch around your chuck.

"Q. Oh, you fit it into that half an inch around—in other words, you have a clearance of half an inch? A. Between each jaw I would say roughly half an inch.

"Q. Is that round, solid, or— A. It is three separate jaws and you have about a—

"Q. You have about a half inch clearance and you put it between the jaws, is that it? A. Yes, sir.

"Q. And when you get it there, do the jaws hold it without anything more? A. It will rest on the jaws, and then you can hold it in with one hand up to the back of the jaw, and you can reach up with one hand and lock the chuck up."

There is no dispute in the record that the outer edge of the splash pan referred to by the witness was thirty-three inches from the chuck and forty-two inches to the center of the machine. The asssitant foreman, testifying on the same subject, said:

"Q. Mr. Kopplin, what is the usual procedure out in your shop in loading castings such as defendant's Exhibit 11 onto machines such as that shown in defendant's Exhibit 8-D? A. We have hooks we use for those. We lift it in the hold and lift it with the overhead crane, and bring it up in the chuck in the machine and secure it in the chuck.

"Q. Do the men in your shop on occasion load castings by hand? A. Sometimes they do, yes.

"Q. Mr. Kopplin, in your experience in the shop, have you ever seen an individual load a casting approximately the size of defendant's Exhibit 11 by hand? A. No.

"Q. You never have? A. No.

"Q. Would it be possible, Mr. Kopplin, for an individual to load this onto a machine by hand if he got up on top of the machine? A. He could, yes.

"Q. Would you show us on this photograph where the individual would have to place himself? A. In the first place, he would have to lift the piece from the floor up on the guard, on the way guard on the other end. Then he'd have to get up on the machine to lift it on his chuck.

"Q. Where would he have to stand? A. He'd have to stand up on top here."

It will be noted that the plaintiff did not mention the necessity of standing on the machine as a necessary part of the operation.

The defendant-appellant claims the following errors:

(1) That the trial court erred in sustaining plaintiff's objection and refusing to permit the introduction into evidence of a part of a business record of the appellant concerning

plaintiff's visits to the defendant-appellant's dispensary, as kept in the usual course of business by the personnel in charge, including the handwritten report entered thereon of the defendant-appellant's doctor who was the head of this department.

(2) That the trial court erred in holding that the plaintiff was not bound by a written waiver of the doctor-patient privilege, as provided by Section 2317.02, Revised Code, contained in the "Application for Adjustment of Claim" (Form C 57 of the department) signed by the plaintiff on the advice of counsel and filed as the first procedural step as the foundation of the claim for compensation here being considered.

(3) That the trial court committed prejudicial error in restricting cross-examination of the plaintiff, which was attempting to show the inconsistency of plaintiff's testimony as to his conduct (not reporting the alleged injury), with his reasons for acting, his knowledge of the surrounding circumstances, and to test the credibility of his testimony-in-chief in such areas.

(4) That counsel for plaintiff committed prejudicial error on many occasions in making improper remarks imputing improper behavior against opposing counsel throughout the trial and in engaging in inflammatory conduct both during the examination of witnesses and in his final argument.

The record shows that the defendant-appellant, in the usual and regular conduct of its dispensary, kept what was designated as a "Dispensary Report" on which were recorded the visits of workmen to the dispensary and among other things workmen's statements explaining the reason for the visit. These records concerning the plaintiff's visits on July 31, 1956, and on August 1, 1956, quoted above, came clearly within the purview of Section 2317.40, Revised Code. In the case of *Perry* v. *Industrial Commission,* 160 Ohio St., 520, the Supreme Court said in the third paragraph of the syllabus:

"3. Under the provisions of Section 12102-23, General Code (Section 2317.40, Revised Code), a hospital record of an act, condition or event is, insofar as relevant, competent evidence if the custodian or the person who made such record or under whose supervision such record was made testifies as to its identity and the mode of its preparation, and if it was made

in the regular course of business, at or near the time of the act, condition or event, and if, in the opinion of the court, the sources of information, method and time of preparation were such as to justify its admission. (Parargaph one of the syllabus in the case of *Schmitt* v. *Doehler Die Casting Co.*, 143 Ohio St., 421, approved and followed.)''

That part of the exhibit ruled out was admissible for still another reason. Dr. Hamilton testified that that part of the record excluded was in his handwriting and was written as he interviewed the plaintiff, at which time he recorded what the plaintiff told him. He also testified that he had no independent recollection of the incident and that reading the entry of August 1, 1956, did not bring back or awaken in his memory the event recorded. He did testify, however, as to the circumstances under which the record was made and that he know from his knowledge of the manner in which the record was made that he could affirm the truth of such entry. The record was, therefore, clearly admissible. A case directly in point is *Pickering* v. *Peskind*, 43 Ohio App., 401, where, on page 413, the court said:

''It has been repeatedly held that, when the witness, after examining a memorandum, cannot testify to an existing awakened knowledge of the fact independently of the memorandum, but can testify that at or about the time the writing was made he knew its contents, and that he is still satisfied that its recitations are true, both the testimony of the witness and the memorandum are admissible. It is said that the two are the equivalent of a present positive statement of the witness, affirming the truth of the contents of the memorandum, and the memorandum is admitted, not as substantive evidence by itself, but as merely auxiliary to the testimony of the witness. There are many everyday transactions, in commercial establishments particularly, which after a little time could not otherwise be proved.

'' 'It is not to be supposed that officers and clerks in large trading and other business establishments, can call to mind all that has been done in the course of their employment; and when their original entries and memoranda have been duly authenticated, and there is nothing to excite suspicion, there can be no great danger in allowing them to be laid before the jury.' *Bank of Monroe* v. *Culver*, 2 Hill (N. Y.), 531. Accordingly we find no error in the admission of evidence,''

See, also, *Steiger* v. *Coca Cola Bottling Co.*, 31 Ohio Law Abs., 215.

The entry on August 1, 1956, in the handwriting of Dr. Hamilton, was clearly admissible, and the sustaining of the objection to the introduction of that part of the exhibit constituted prejudicial error.

The second assignment of error is also well taken. The plaintiff admitted signing a paper like the form in the record, which constituted his application for adjustment of claim (filed in the case) which he signed in his lawyer's office. This form (Ind. Comm. C 57 on yellow slips) contains a waiver of the patient-doctor privilege as follows:

"By signing this application I expressly waive, on behalf of myself and of any person who shall have any interest in this claim, all provisions of law forbidding any physician or other person who has heretofore attended or examined me, or who may hereafter attend or examine me, from disclosing any knowledge or information which they thereby acquired."

The question was presented because the court sustained plaintiff's objection to the right of the defendant-appellant to call as its witness Dr. Karl Alfred, admittedly consulted by the plaintiff in a patient-doctor relationship upon the recommendation of Dr. Hamilton. The court requested testimony concerning the circumstances under which the application containing the waiver was signed by the plaintiff. The record discloses the following:

"Q. Mr. Ronald, do you remember testifying in my office under oath, with a court reporter, and with Mr. Weil there? A. Yes, sir.

"Q. Do you remember being shown this yellow document that says C-57, and the young lady marking it, and your being asked questions about it? A. Offhand, that don't mean too much to me, but I probably—

"Q. You probably did, didn't you? A. Yes, sir.

"Q. At the time you signed that, you signed that where, in Mr. Weil's office? A. That I don't remember.

"Q. You don't remember going to Mr. Weil for the first time? A. Yes, sir.

"Q. Do you remember signing a paper like that the first time? A. A yellow form, yes, sir.

"Q. You do? A. Yes, sir.

"* * *

"Q. You went to a lawyer to advise you as to your rights, did you not? A. Yes.

"Q. Did he advise you as to your rights? A. Yes, sir.

"Q. And you signed that paper, being well aware of your rights, didn't you? A. I don't know exactly what that paper states. This has been quite a few years ago, and I don't—

"Q. You can't deny you did read this language here, by signing this application, et cetera, before you signed it, can you? A. I can't say that I remember reading that.

"Q. And that is right— A. To be truthful about it.

"Q. Over here it says, 'I have read all the statements contained herein, and know the same to be true and correct.'

"Mr. Weil: I object. He said he can't remember.

"The witness: I still don't remember if I read that or not.

"Q. You can't remember? A. No.

"Q. But you don't deny you did? A. I don't deny that I read it or I don't deny I didn't read it. I don't remember.

"Q. Mr. Ronald, in April of 1961, when you appeared in my office for deposition, were you asked this question and did you give this answer in relation to that form, 'Did you read it?' A. Could I break in here?

"Q. I don't want you to break in. 'Q. Did you read it and understand it before you signed it? A. Yes, sir.' Did you or did you not make that statement?

"Mr. Weil: Objection.

"The Court: He may answer if he can recall.

"A. I possibly made that answer.

"Q. You did, didn't you?

"Mr. Weil: Objection

"The Court: Objection sustained as to the form of the question.

"Mr. Calhoun: I will take an exception.

"The Court: Exception may be noted. The objection is sustained as to any waiver. Now can we call the jury back?

"Mr. Calhoun: Doctor, thank you very much."

The plaintiff's signature is directly under the waiver provision, as is demonstrated by an examination of the exhibit. The application was signed in the office of plaintiff's counsel who, of course, had full knowledge of the holding of the Supreme Court

in the case of *State, ex rel. Galloway,* v. *Industrial Commission,* 134 Ohio St., 496, where the Supreme Court held that the Industrial Commission was required to accept a claim presented on its claim form on which the claimant had deleted the paragraph containing the waiver of the patient-doctor privilege provision before signing and filing it. The legal right of the plaintiff to voluntarily waive the provisions of Section 2317.02, Revised Code, is so well established that the citation of authority is unnecessary. Because of the equivocal nature of the plaintiff's testimony, together with the surrounding circumstances, there is not the slightest suggestion that his signing of the waiver was other than his own voluntary act. When the application was signed, he was out of the presence of the defendants and was under no compulsion to sign it. Thus, the plaintiff is bound by the rule that one who voluntarily signs a paper is charged with knowledge of its contents, and this, together with all the circumstances and facts as above detailed, makes it clear that there was no legal basis for holding that the plaintiff was not bound by the waiver. Dr. Karl Alfred should have been permitted to testify to such relevant matters as came to his knowledge when visited (on two occasions) by the plaintiff.

The third claim of error deals with the alleged limitation of defendant-appellant's right to extensive cross-examination of the plaintiff in the area of and to question his reasons for not reporting his having experienced a physical injury while at work. As was indicated by some of the quoted evidence above and in other places in the bill of exceptions, the plaintiff said that he did not report the injury because he did not want to jeopardize his job, or "I was afraid. I had three kids and a wife and I was on probation," and "I didn't want to be a burden to the company," and other statements of like character. The evidence is not in great dispute that he did not report the alleged injury to his employer or to the doctors with whom he first consulted, except that he claimed to have said something about it to Dr. Hamilton "but not in great detail." Dr. Hamilton's notes, as made on the dispensary record, contradict this statement, but the record is not in dispute that he did not consult a doctor after seeing Dr. Alfred early in August 1956, until he consulted Dr. Silver in early October. It would seem that upon this state of the record a more extended examination

of the plaintiff dealing with any relevant knowledge he may have had about his employer (whether there could be any justification to fear the loss of his job) that would justify withholding a report of his claimed injury was allowable.

The last claim of error deals with whether, due to alleged derogatory or inflammatory statements made in the presence of the jury during trial and in concluding arguments, the defendant-appellant was prevented from having a fair trial. A reading of the entire bill of exception shows that the case was tried in a bitter atmosphere. Many, many statements were made which were highly improper. It would serve no useful purpose to recount them here. It is enough to say that this claim of error is well taken.

For the foregoing reasons, the judgment appealed from is reversed and the cause remanded for further proceedings according to law.

*Judgment reversed.*

KOVACHY, P. J., and HURD, J., concur.