Jean Rae SUTTON, aka Jean S.
Griffin, Plaintiff,

v.

NATIONAL DISTILLERS PRODUCTS
CO., and Distillery Workers Local
32, Defendants.

No. C–1–77–96.

United States District Court,
S. D. Ohio, W. D.

Feb. 24, 1978.

**1320**

Randal S. Bloch, Cincinnati, Ohio, for plaintiff.

Frank H. Stewart, Robert I. Doggett, Cincinnati, Ohio, for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

DAVID S. PORTER, Chief Judge.

This is a thoroughly litigated sex discrimination case brought pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* The Court has jurisdiction under 28 U.S.C. § 1343(3) and (4) and 42 U.S.C. § 2000e–5(f)(3). Venue in this District is not disputed.

Counsel cooperated in the preparation of a final pretrial order, which contained a statement of undisputed facts. The case was well presented. Nonetheless, certain unforeseen difficulties arose, and what was expected to take one day to litigate instead took three days. The following general and incomplete statement of the undisputed facts should set the stage.

Plaintiff was the lone female out of 23 guards at a distillery whose employees agreed to a company policy requiring a body search on exiting the plant to prevent pilfering of small tools and liquor. Shortly after plaintiff's hire she was injured on the job. She was off work for a short time, but returned and was temporarily placed on a shift which was not her regular shift. While on this new shift, she performed body searches of male employees. Certain of the 500 male employees objected to being searched by a person of the opposite sex, which led to a controversy. The Company reverted to its former policy of same sex searches, and the plaintiff was relieved of her duty in that regard. Later the plaintiff suffered complications from her on-the-job injury, and had to be hospitalized. She had to take sick leave, and although she received some salary continuation as a supplement to workmen's compensation for a couple of months, this was cut off and she was placed on workmen's compensation only. Eventually she was terminated as an employee.

Immediately after being relieved of her duty to search men but before any adverse action was taken against her, plaintiff filed a complaint with the E.E.O.C., alleging that this was sex discrimination. After her termination, she amended her claim to allege that the termination of her salary continuation and the ultimate termination of her job were in retaliation for her filing a charge with the E.E.O.C.

Originally, plaintiff sought to represent all female employees of the Company who have been or might in the future be adversely affected by a number of alleged practices and policies (doc. 1), which appeared to have no effect on plaintiff. The Court set a date for a hearing to determine whether or not plaintiff "suffered the same sort of injuries" or "possesse[d] a sufficient similarity of interests to make [her] a proper class representative." *Alexander v. Aero Lodge, et al.,* 565 F.2d 1364 (6th Cir. 1977). It was the Court's intention that plaintiff be ready to try her individual claims in the event that the class was not certified. Had

the hearing on class certification come to fruition, the Court would not have permitted certification of issues involving practices that clearly did not result in injury to the plaintiff. To have standing to sue as a class representative, the representative must be part of the class and "possess the same interest and suffer the same injury" as the class members. *East Texas Motor Freight System, Inc. v. Rodriquez*, 431 U.S. 395, 97 S.Ct. 1891, 52 L.Ed.2d 453 (1977). *See also Doctor v. Seaboard Coast Line R.R. Co.*, 540 F.2d 699 (4th Cir. 1976); *Golden v. Lascara*, 541 F.2d 277 (4th Cir. 1976); 18 *For The Defense* No. 9 at 125–28 (DRI September 1977). On December 14, 1977, plaintiff moved to dismiss her class action allegations, and such motion was granted at trial (doc. 30), rendering the class claims moot. From the facts recited herein, it can be seen that plaintiff is a class of one.

The specific claims that remained for trial were whether defendants violated Title VII by: (1) relieving her of her required job duties (searching male employees) because she is a female, or in the case of the Union, inducing the same; (2) rearranging her "job rotations," including overtime work to her detriment because she is a female; (3) ceasing her salary continuation benefits after an on-the-job injury, while male employees injured or ill had extended or indeterminate salary continuation; (4) retaliating against her for her filing of a charge with the E.E.O.C. alleging discrimination, culminating in her termination; and (5) terminating plaintiff because of her medical problems while males similarly situated were not terminated (*see* final pretrial order). These claims were tried to the Court, and the Court makes the following Findings of Fact and Conclusions of Law pursuant to Rule 52(a).

## FINDINGS OF FACT

1. Plaintiff Jean Rae Sutton, aka Jean S. Griffin (hereinafter called Griffin) is a female citizen of the United States and a resident of the State of Ohio.

2. Defendant National Distillers Products Co. (hereinafter called the Company), is a division of National Distillers & Chemical Corp., doing business in the State of Ohio, and maintains a facility at 120 Section Road, Cincinnati, Ohio, 45216. National Distillers is an employer within the meaning of 42 U.S.C. § 2000e *et seq.*

3. Defendant Distillery Rectifying Wine & Allied Workers of America, Local Union 32 (hereinafter called the Union), is a local labor organization in the State of Ohio. The Union represents production and maintenance employees at National Distillers' Section Road facility. The Union and the Company have had collective bargaining agreements there covering said employees at all times relevant herein.

4. Griffin applied for work as a guard with the Company on May 29, 1973. She was hired as a security guard at the Section Road facility beginning on July 9, 1973. She never held any other position or job with National Distillers.

5. Her general responsibilities as a guard were to perform police duties either at a fixed post or on tour; to maintain order using force when necessary; to make rounds of premises periodically to protect property against fire, theft and illegal entry; to check the identities of employees and other persons entering the plant; to search employees leaving the premises in accordance with plant policies; and to administer first aid in emergency situations when an industrial nurse is not available.

6. As a guard, Griffin was not eligible to join the Union or to be covered by its collective bargaining agreements.

7. At the time Griffin worked for the Company, she was the only female guard. No female guards are presently employed at the Section Road facility. Since January 1, 1972, three women, including Griffin, have applied for employment as security guards at the Company.

8. Prior to Griffin's hiring, the Company maintained what was, in effect, a same-sex body search policy. Guards (then all male) searched males leaving the plant. Female production supervisors searched female employees. The searches, described as pat-downs, were conducted to prevent the theft of tools and small bottles of liquor (prod-

**1322**

uct). Although two female security matrons had been on the payroll years ago, they did not perform "guard" duties and did not search males leaving the plant.

9. Witnesses from the Company, from the guard force and from the work force differed on the scope of the pat-downs. That is, there was a difference of opinion as to how intrusive the pat-down was. According to the guards, it was superficial, consisting of a pat-down of the back, the waistband, the pockets and the outside of the legs, including an occasional check of the ankles (socks). The employees contended that the insides of the legs were checked, which involved occasional brushing of the groin area. It is not surprising that there was some conflict in the testimony at trial, because there had been numerous complaints about and conflict over the scope of such searches prior to August 10, 1973, when a controversy arose concerning Griffin's role in body searches of males.

10. When Griffin was hired she was advised of the benefits received by guards as salaried employees, including life insurance, health insurance, pension and sick pay. Griffin contends, and the Company denies, that she was told she would receive salary continuation while she was ill, regardless of the duration of the illness. There was evidence that other guards were told that at least one male guard had received salary continuation for as long as a year. Specifically, Robert Connally, one of plaintiff's witnesses, testified that he was not told of any maximum duration on sick pay or any minimum time of service before one became eligible for that benefit. However, on cross-examination he said that his interviewer on hire did not say he would get paid indefinitely. A witness for the Company did agree that applicants were not specifically told there was a maximum duration or a minimum period of service.

11. Company records introduced by the plaintiff establish that if an employee was expected to be off more than two weeks, approval had to be obtained for a salary continuation (November 8, 1971 letter, attached to PX6). H. B. Thompson who handled salary continuation, testified that he did not have authority to grant indefinite salary continuation. The records show that seniority was noted, and may have played a part in, at least one decision (May 9, 1975 letter, PX2; July 30, 1974 letter relating to Peter Van Liere). The records show that the company was providing salary continuation for temporary (as opposed to indefinite) medical absences. The requests for approval include expected dates of return, and also show that the Company sought or received information from claimants and their doctors (PX2; January 23, 1974 note attached to PX4; July 30, 1974 letter attached to PX4; November 4, 1971 letter attached to PX4; Dr. Thielen's note attached to PX6; February 2, 1972 letter attached to PX7; January 10, 1967 note attached to PX8). The duration of salary continuation in specific cases was, for example, two and a half months (Salyers), three months (Meddings), five months (Leppert), one month (West), three months (Daubenmerkl), and less than a month (Gerber) (see also Joint X VII). The only "exception" was Peter Van Liere. Van Liere developed an extremely serious diabetic condition which affected his legs. He could not pull rounds and the Company records note that he would have difficulty at Gate 19, which requires "considerable walking to and from departing truck trailers." Van Liere had worked for the Company since 1966, but as of May 9, 1975, may not have qualified for disability retirement. The Company was considering keeping him on until he could qualify for disability retirement benefits, although no commitment had been made as of May 9, 1975 (PX2). James Stander of the Company suggested a reduced work week to avoid the rounds, but also noted that the Company policy had been "to make exceptions for people on posts which require non-strenuous duty only in temporary situations," while Van Liere's case looked like it might be indefinite. He also noted that changing the schedule might require the use of an overtime man while the Company was paying Van Liere straight time. Stander's note indicates that he, Stander, would accordingly make no commitment until he heard from his superiors (PX2). Initially, the

Company had indications that Van Liere would return November 18, 1974 (November 4, 1974 letter). After the initial six-month continuation, he returned to work in only a partial capacity. This is what gave rise to Stander's May 9, 1975 letter.

It should also be noted that Leppert, who received salary continuation for five months, died while he was on salary continuation. He had terminal cancer.

The testimony of Company officials, which was corroborated by the Company's records, was that the Company had a light duty policy that depended on the work available, the employee's ability, whether the light duty would be on a permanent or temporary basis, and on the circumstances of the particular case.

For example, Meddings received a light duty assignment due to his use of a back brace. However, such work was available, and the Company knew it was a matter of providing such duty for a limited time. Sullivan testified that the Company sought medical evidence in connection with requests for salary continuation (*see also* Joint X XII). Sullivan testified that Van Liere's case was unique because of his seniority, that he could do body searches, that he could do some walking, other than rounds, that his seniority entitled him to work in the first shift, where rounds were not necessary, and that his doctor wanted him to walk to some extent.

In all, Van Liere got some form of salary continuation from July 5, 1974 to January 5, 1975 and from March 14, 1975 to April 19, 1975. He received light duty from January 6, 1975 to March 13, 1975, and from April 20, 1975 to the present (Joint X XII). The Joint Exhibits corroborate the testimony that by virtue of Van Liere's seniority he was able to work the first shift, where rounds are not necessary, except for Sunday. He was allowed off Sunday.

There is no evidence that any of the men who allegedly received better treatment than plaintiff received workmen's compensation, or would have been eligible for workmen's compensation, while they were on salary continuation (*see e. g.*, Van Liere —diabetes; Saylers—broken leg from sports activity; Meddings—back injury from April 3rd tornado; West—asthma, emphysema and a liver condition; Daubenmerkl—auto accident; Gerber—"illness"; Leppert—terminal cancer; PX2, 3, 5, 6, 7 and 8).

However, there was testimony that when an employee is on salary continuation and also has a disabling injury at the same time, salary continuation would take the form of a supplement to workmen's compensation to bring total payments up to 100 percent of salary provided that certain conditions are met, *i. e.*, the expected duration of the disability, etc.

There was testimony that a salary continuation request was not sent forward in plaintiff's case, because initially the Company had no information on her possible date of return. This may have been inconsistent with what was done in the Van Liere and Leppert cases, because it is not all that clear that the Company really knew their expected date of return. Whether the procedures in plaintiff's case were the result of something intentional or the result of oversight the Court cannot say without speculating but she got two months' continuation (JX III, VII), in the sense that she received workmen's compensation and "supplementation" which gave her 100% of her salary up to February 18, 1974.

12. Mrs. Sutton, the plaintiff, was employed as a guard on July 9, 1973. On August 4, she was injured when she stepped into a hole while walking her rounds. She was off work until August 7. Her ankle injury aggravated a preexisting varicose vein problem. She returned to work December 8, 1973 and worked through December 16. The diagnosis was thrombo-phlebitis, pulmonary emboli and obesity (D–1–I; D–1–H).

The earlier diagnosis was confirmed in a consultive report (D–1–H) from Providence Hospital. In addition, she was later admitted to Good Samaritan Hospital on June 11, 1976, and discharged June 21, 1976, for "deep venous thrombosis, left leg" (D–1–G, last page). Dr. Antarik ruled this out, but Dr. Schleuter concluded that such a condi-

tion was present, and that the character of her phlebitis would preclude any long-term physical activity. Dr. Bruno concurred in the diagnosis of "deep venous thrombosis." She was later admitted to Providence Hospital for thrombo-phlebitis, at which time it was also noted that her medical history included problems with degenerative disc disease, osteoarthritis and obesity (D–1–F).

13. Plaintiff testified she had discomfort going up and down stairs and must elevate her leg when it swells. It swells when she walks excessively. She said that she could go back to a desk job or light duty, but she was not given a chance to do so. She testified that she did not apply for other security jobs because she didn't think she could pass the company physicals.

There was some testimony by her in her deposition that the body searching bothered her legs, because bending ("pumping") caused swelling. She felt that she could do light work, which she had discussed with other guards, but not with the Company, because there are some stationary or "sit-down" gates that do not involve rounds or stairs.

She testified that she mentioned a neck and arm injury caused in an auto accident at her initial interview, but that it was generally okay. This was denied by Company officials.

She testified that she gets blood clots and must elevate her legs several times a day for a total of two to three hours. Sometimes the clots require bed rest.

Plaintiff's testimony at trial and in her deposition about her condition should be compared to what the job requires. A witness from the Company described the rounds that guards have to walk in the various shifts. The third shift, plaintiff's regular shift (assigned on the basis of seniority), involved some rounds that took as much as two hours. Some of the buildings that had to be checked during the rounds involved walking up two, seven and eight floors. Rounds were pulled on shift two and three, and on shift one on Sundays. Within a given shift, the guards were switched around from post to post so they could not become overly familiar with the

employees (production workers). The guards were assigned to the various posts in pairs and they took turns on rounds.

14. Plaintiff sought workmen's compensation under Claim No. 71–21511 for an injury from an auto accident while she was working for Arlan's Department Stores. Her doctor reported a 60% permanent partial disability. She was awarded 35% permanent partial disability benefits for 70 weeks (D–2–F). She subsequently received an increase of 15% for 30 weeks (D–2–F), and there was also some testimony regarding an additional lump sum payment.

There is no evidence that the Company knew of this prior to her termination.

This prior claim was brought up by the defendant Union for impeachment purpose. Specifically, it was noted in a wage statement submitted in connection with Claim No. 71–21511 that claimant reported that she was unable to work as a result of the "Arlan's" injury from September 8, 1972 to July 9, 1973. At the same time, the plaintiff was drawing unemployment compensation (D–2–E).

The Union contended that this document had an impeachment value because Ohio Rev.Code § 4141.29 requires that one of the pre-conditions to eligibility for unemployment compensation is that the individual be able to work, available for suitable work, and be actively seeking suitable work, and because she failed to note any handicaps on her employment application. This latter basis of impeachment, at least, is dubious, in light of her report on the same document, that her condition had improved sufficiently to permit a return to work on July 9, 1973.

15. During her stay at Providence Hospital in December, 1973, plaintiff was visited by Mr. Seilkop, the Company's Supervisor of Safety and Security. He visited her to obtain her signature on her workmen's compensation claim forms. The plaintiff testified that Seilkop demanded that she sign the form. He testified that she would not because the doctors listed on the form were not her doctors ("her doctor was on North Bend"). She testified that she was

too sick to deal with the forms (she testified that she had been told she was going to die), that he became ugly, told her she would be in trouble if she did not sign it, and that he "did not care if [she] lived or died" (which Seilkop denied). The plaintiff's testimony was corroborated by Mrs. Lottie Nelson, who was a patient—occupant of the same room. Mrs. Nelson also recalled that plaintiff told Seilkop to contact Dr. Schapera and an attorney.

Plaintiff did not sign the forms then, and Seilkop subsequently sent the forms and other requests for information through Dr. Schapera, pursuant to his instructions (see D–1–M, N, O, P).

Seilkop testified that he was told by Dr. Schapera not to see her because she was in too bad a condition, that Seilkop had upset her, and that all correspondence should be routed through him.

Obviously, conflicting inferences may be drawn from what transpired at this visit. Mr. Seilkop's conduct might be attributed to retaliation by the Company, or it might just as easily be attributed to a personal conflict.

16. The most critical document in this case is a report from Mr. Thompson, of the Company's Cincinnati Division, to Mr. Swim, the Vice President of Industrial Relations, dated August 7, 1974 (PX9). The report deals with a proposed letter to plaintiff, dealing with her termination. The report noted that on February 18, 1974, plaintiff was given a leave of absence without pay and was placed on workmen's compensation for a temporary total disability, which she is still receiving. The report attached a copy of Form C–84, supplied by Dr. Schapera, stating that plaintiff could return to light work January 1, 1975 and regular duty January 1, 1995 (D–1–J).

The same letter said that the Company did not have light duty work for guards. That is arguably inconsistent with the Van Liere and Meddings situations. On the other hand, it is arguably consistent with the Company's light work policy. In addition, light work would not be a temporary accommodation in the present case since plaintiff might require light work until 1995.

The report also noted that plaintiff had filed a charge with the E.E.O.C., alleging sex discrimination.

It was recommended that plaintiff be terminated (1) because her six-month leave of absence without pay would terminate at the end of August, 1974, and that an extension would establish a precedent; (2) that she could not do light duty work until 1975, and that it was beyond imagination to carry plaintiff on the rolls for 21 years until 1995 (referring to Dr. Schapera's report); (3) that plaintiff was receiving workmen's compensation; and (4) that no other employee had been able to carry the Company life insurance beyond six months.

## CONCLUSIONS OF LAW

17. Section 703(e) of the Act contains an exception to otherwise applicable prohibitions for bona fide occupational qualifications (BFOQ's). The BFOQ's fall within two categories relating to "ability to perform" and "same sex." The former category has no relevance to this case. The "same sex" BFOQ relates to the accommodation of the personal privacy of clients, customers and arguably other employees. *See generally Schlei and Grossman, Employment Discrimination Law,* 278–79, 290–92 (1976). Plaintiff contends that the Company denied her the opportunity to search males. By that, we understand that she contends that she was denied the opportunity to perform one of her duties, that this had an adverse impact on her job opportunities, and that the Company's policy was not based on a legitimate BFOQ.

18. There is also law on the subject of retaliation. In the case of an alleged retaliatory discharge, the employee must make out a *prima facie* case by showing (1) that he engaged in a protected activity (such as filing an E.E.O.C. charge); (2) that the employer knew of this protected activity; (3) that he was subsequently discharged or subjected to other damages; and (4) that the employer had a retaliatory motive or that the timing of its action was such as to

allow an inference of retaliation to arise. The burden then shifts to the employer to articulate a legitimate, non-discriminatory reason for the discharge or other action. If a reasonable basis is shown, the burden shifts back to the employee, who has the opportunity to demonstrate by further evidence that the reasons assigned by the employer are pretextual. *Hochstadt v. Worcester Foundation*, D.C., 425 F.Supp. 318, *aff'd* 545 F.2d 222 (1st Cir. 1976); *Croller v. Boeing Co.*, 15 F.E.P. 165 (E.D.Pa. 1977); *Bradington v. International Business Machines Corp.*, 360 F.Supp. 845 (D.Md. 1973), *aff'd* 492 F.2d 1240 (4th Cir. 1974). *See also Long v. Ford Motor Co.*, 496 F.2d 500 (6th Cir. 1974).

19. The Company contends that it terminated the plaintiff due to her medical condition and not in retaliation for the filing of a charge. The plaintiff resisted any reference by the Company to plaintiff's medical history on the ground that the medical reports offered by defendant were privileged under the common law or under Ohio Rev.Code § 4123.27 (doc. 33 and objections made at trial).

It appears to this Court to be unfair to shift the burden of proof to a defendant (see *prima facie* case at ¶ *18 and 23*) and then preclude the defendant from offering evidence by interposing a privilege. This would permit the use of a privilege as a sword.

▪ In addition, there is no federally-created physician-patient privilege, *Hardy v. Riser*, 309 F.Supp. 1234, 1236–37 (N.D.Miss. 1970). That privilege is a creature of state statute. It did not exist at common-law, and was not recognized in proposed Rule of Evidence 501. The Rule as it was adopted applies state privilege law only in diversity cases. Accordingly, the Court overruled objections based on a physician-patient privilege.

Even assuming that a privilege applied, there was no evidence that when plaintiff's application for workmen's compensation was signed, she did not sign it voluntarily. The form she signed was sent to her through her doctor. There is no reason to hold that she is not bound by the waiver of privilege contained on that form. *See Ronald v. Young, Administrator*, 117 Ohio App. 362, 187 N.E.2d 74 (C.A.Cuyahoga Cty. 1963). *Galloway v. Industrial Commission*, 134 Ohio St. 496, 17 N.E.2d 918 (1938), relied on by plaintiff, is not contrary. It only held that the Industrial Commission cannot refuse to process a claim on condition that the waiver is signed. *Ronald v. Young*, 187 N.E.2d at 82; *Young, Ohio Workmen's Compensation Law* § 11.1 (1971).

Finally, the Court concludes that (apart from traditional privilege claims) Ohio Rev. Code § 4123.27 does not prevent consideration of medical reports filed with a self-insured employer in this type of case. That statute provides that information contained in the annual report provided in § 4123.26 of the Revised Code, or such other information as may be furnished to the Industrial Commission by the employer pursuant to § 4123.26 (*i. e.,* "such other information as may be required by the commission under this section") is for the exclusive use of the Commission and may not be used in any court unless the Commission is a party. There was no showing that any of the information introduced by the defendant was § 4123.26 information, *i. e.,* information contained in the annual report or other information furnished to the Commission by the employer pursuant to § 4123.26.

20. The Court concludes that the Company did relieve plaintiff from the duty of searching male employees due to the objection of members of the Local. However, the Court concludes that her claim for sex discrimination on this ground must fail.

First, the Union *qua* Union had only a minimal connection with the search issue. Some male employees, but not all male employees, objected to the searching of males by plaintiff. Some female employees, wives of male employees, objected to their husbands being searched by plaintiff, and voiced the fear that they might be searched by males (a groundless fear, as far as the Court can determine). The Union president, Paul Rainey, did not initiate discussions with management on this point, but

instead was called in by management. When Rainey was informed that disciplinary action might be taken against employees, Rainey stated that this would result in the filing and processing of grievances on behalf of those employees who objected to being searched by plaintiff.

The Union president was merely representing the position of certain of the employees in the bargaining unit. No evidence shows any involvement by the Union in any other aspect of the alleged discrimination (i. e., salary continuation, termination, work assignments, loss of overtime, etc.), or even the decision to change her work responsibilities.

 In addition, the Company did not deny plaintiff a job as a guard because she was a female. *Compare Reynolds v. Wise,* 375 F.Supp. 145 (N.D.Tex.1974) (Bureau of Prisons could not maintain a policy that only males could be appointed as correctional officers, but could selectively assign work responsibilities in a manner reasonable to insure the privacy of inmates, and such selective work responsibilities did not discriminate against women). The Company relieved her of search duty. The Court cannot say that the employees had no right to object to what they perceived to be a violation of their privacy, nor can the Court condemn the Company for compromising with its employees on such an issue.

Finally, the Company made a convincing showing that no damage was suffered *as a result of a change back to a male-male search policy,* or assuming that there was, that it was minimal. Specifically, plaintiff was only performing body searches due to her ankle injury. Her regular shift (the third shift assigned on the basis of seniority) required little, if any, such duty. In addition, the evidence shows that plaintiff received her share of "8-hour" overtime shifts (D–1–D column 8). As far as "other" overtime (allocated in portions of less than 8 hours) is concerned, the low amount she

received could as easily have been due to plaintiff's absenteeism as due to any discrimination by the employer (as a result or a change in the search policy) (D–1–U). To get this type of overtime, the employee has to be there on that day. In other words, the evidence does not establish that she suffered a loss of overtime due to scheduling or discrimination.[1] Nor could the plaintiff herself explain what she lost.

 Discrimination in job rotation is a difficult claim to handle, because she had no right to select her shift. She was assigned to the third shift in accordance with her seniority. Her "shift rotation" claim apparently arises from her argument that she lost first and second shift overtime because of sex discrimination, which the Court rejects, or from her argument that she should be able to choose another shift, or light duty due to her medical condition.

21. For the reasons stated, the Court finds in favor of the Union on all issues,[2] and finds in favor of the Company on the claims that (1) the Company discriminated against plaintiff on the basis of her sex by relieving her of the duty of searching male employees in violation of Title VII; and (2) as a result, discriminated against plaintiff on the basis of her sex by rearranging her "job rotations" and causing a loss in her overtime, in violation of Title VII.

 22. As far as termination of her salary continuation and retaliatory discharge are concerned, plaintiff need not establish the validity of her sex discrimination charge in order to establish a charge of retaliation. *Hyland v. Kenner Products,* 11 E.P.D. ¶ 10,926 (S.D.O.1976). *EEOC v. Kallir, Phillips, Ross, Inc.,* 401 F.Supp. 66, at n. 6 (S.D.N.Y.1975).

Of course, retaliation may be established by direct or circumstantial evidence. *Schlei and Grossman, supra,* at 438–39. The problem area lies in the burden of proof. Four

---

1. In fact, she got overtime during her probationary period, which was not the Company practice, and which led to a complaint by another guard (D–1–T). She may have lost overtime on a particular shift, but there was no disparate effect on her total overtime hours.

.2. In terms of the statute, the Union did not cause or attempt to cause discrimination as proscribed in 42 U.S.C. § 2000e–2(c)(3).

possible standards may apply: whether the filing of a charge (1) played any part in the challenged action, no matter how remote or tangential, (2) played a substantial factor in the challenged action, (3) was the principal, though not the sole reason, for the employer's action, (4) or whether or not the adverse employment action would have taken place had there been no protected activity. *See generally Schlei and Grossman, supra,* at 440. The Court notes that the fourth test is the test most consistent with the Supreme Court's decision in *Mt. Healthy City Board of Ed. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), which is at least analogous. A choice of rules was avoided in *Hochstadt v. Worcester Foundation,* 545 F.2d 222 (1st Cir. 1976), which is cited by plaintiff. As that Court noted, "the mere establishment of a *prima facie* violation of § 704(a) does not compel the conclusion that the discharge was based in some part on impermissible grounds assuming the employer satisfied the Court . . . that the actual reasons were legitimate ones." *Hochstadt v. Worcester Foundation,* 545 F.2d at 234, n. 8.

23. The Court concluded that the timing of the discharge and cut-off in salary continuation, and Seilkop's conduct at the hospital might have supported an inference of retaliation sufficient to overcome a defense motion for a directed verdict. The employer knew of the filing of the charge prior to plaintiff's termination (PX9).

While Dr. Schapera's report ruling out regular duty until January, 1995 and light work until January, 1975 (D–7–J; PX9) was dated April 22, 1974, so that it was not available to the employer when plaintiff's salary continuation was stopped and she was placed on workmen's compensation, the report was available to the employer and was certainly one of the reasons, if not the reason, the employer decided on terminating her (PX9, Recommendation, 6).

In addition, aside from other factors indicating that plaintiff was not similarly situated with other employees who allegedly received more favorable treatment, the Court must take account of the fact that plaintiff received workmen's compensation after her salary continuation (supplementation) was "cut off." Although plaintiff alleges disparate treatment because both were not continued, and although some people in the past had in effect received "more," the Court is simply not convinced that the failure to give her both workmen's compensation for a temporary *total* disability and salary continuation was the result of a retaliatory motive.

24. The Court concludes that the defendant proved it did not discriminate on the basis of sex and did not take adverse action against plaintiff in retaliation for the filing of a charge, and that the plaintiff did not show that the assigned reasons for the employer's action were pretextual. The Court concludes that on a preponderance of the evidence, the filing of the charge was not a substantial factor in, or the principal reason for, the employer's action, and that in any event, that action would have been taken had there been no protected activity, although it may have contributed tangentially in causing the employer's action.[3]

Instead the Court concludes that plaintiff was terminated due to her medical condition, as reported to the Company in Dr. Schapera's report. From that report the Company had a reasonable basis in concluding that she would not be able to perform her regular duties for an extended period into the future. In addition, the plaintiff's testimony at the trial leads the Court to conclude that she cannot perform her regular duties at the present time. The Court concludes that plaintiff's contentions that the Company should have had a "company doctor" examine her, or should have given

---

**3.** The Court has considered and applied all of the legal standards that might arguably apply to the issue of "causation," notwithstanding the Supreme Court decision in *Mt. Healthy.* The reason the Court has not adopted the *Mt. Healthy* standard is that such a standard may not apply where retaliation is proscribed by statute, and in light of the fact that the Civil Rights Act is primarily enforced by private litigants. *See also N.L.R.B. v. Retail Store Employees Union,* 570 F.2d 586 (6th Cir. 1978); *N.L.R.B. v. West Side Carpet Cleaning Co.,* 329 F.2d 758, 761 (6th Cir. 1964).

her a chance to try some kind of "light" work should not change the Court's analysis. In light of her own testimony regarding her medical condition, the Court can only speculate as to the kind of light duty that she might be able to perform. It would appear that the Company would have to create something special for her, or continue to pay her salary continuation and workmen's compensation for an indefinite period until such time as she is able to perform her regular duties.

While the employer moved for and received an order allowing it to conduct a physical examination of the plaintiff, no such examination was conducted. Plaintiff would have the Court draw an adverse inference from that fact. The Court refuses to draw such an inference. Plaintiff could have presented new medical evidence as to her ability to perform her job and did not.

25. Finally, the Court must note the difficulty of computing a back pay award, in light of the rule that the Court must subtract from the total allowable award any interim earnings or amounts which could have been earned with reasonable diligence by one discriminated against. *Jurinko v. Wiegand Co.,* 477 F.2d 1038 (3d Cir. 1973); *McLaughlin v. Mercury Freight Lines, Inc.,* 472 F.2d 1406, (5th Cir. 1973); *United States v. Wood, Wire & Metal Lathers, Local 46,* 328 F.Supp. 429 (S.D.N.Y.1971).

The only evidence relating to plaintiff's post-termination employment history that surfaced at trial was plaintiff's testimony that she did not attempt to find other *security* work because she did not think she could pass the physical examinations "for insurance purposes." There was no evidence that she actually applied for such a position or any other type of work.

26. Accordingly, the Court finds in favor of all defendants on all claims.

### ORDER

This is an action for sex discrimination brought pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* For the reasons stated in an Opinion filed simultaneously with this Order, the Court finds in favor of all defendants on all claims.

The defendants' oral motion for a fee award is denied inasmuch as plaintiff's claims were not frivolous, unreasonable or clearly groundless. *Christiansburg Garment Co. v. EEOC,* —— U.S. ——, 98 S.Ct. 694, 54 L.Ed.2d 648 (1978).

So Ordered.