**Gloria H. CONLEY, Plaintiff,**

v.

**KENTUCKY FRIED CHICKEN CORP.; David Klosterman; Stan Pearman; Dennis Royer; and George Karvorkian, Defendants.**

Civ. A. No. C 82–0034 L(A).

United States District Court, W.D. Kentucky, Louisville Division.

Feb. 28, 1985.

Isaac Lorean Conley, Jr., Edwin C. Lester, Louisville, Ky., for plaintiff.

Richard S. Cleary, Louisville, Ky., for defendants.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND MEMORANDUM OPINION

ALLEN, Chief Judge.

This action is submitted to the Court for decision following a three-week trial and the filing of briefs. The original complaint alleged five counts of discriminatory treatment based on 42 U.S.C. § 2000e, *et seq.* After the Court dismissed Counts 1 through 4, the plaintiff amended her complaint, realleging Counts 1, 3, 4, and 5 as Counts I, II, III, and IV. The first counts are in Arabic numerals and the last are in Roman numerals. Finally, a second amended complaint alleging discrimination under 42 U.S.C. § 1981 as to Counts II, III and IV, and as to 42 U.S.C. § 2000e under Count IV, and also asserting claims under the Equal Pay Act and KRS Chapter 344 were allowed to be filed.

At the outset it should be noted that by far the most important claim in the action is the claim made that plaintiff, a black female, was terminated on March 24, 1981 because of her race. A great deal of testimony was taken on this issue, and it is the only issue which requires extensive fact-finding and analysis. It should also be observed that plaintiff's Equal Pay Act claim was dismissed at the trial since the evidence reveals no instance where the defendant company paid people who were equally qualified as plaintiff larger salaries.

The testimony reveals that some employees who held the same rank as plaintiff did receive $16,100 a year, whereas plaintiff received $15,000; but all of these employees had additional tenure and experience or a degree, which entitled them to be paid more than plaintiff and others like plaintiff.

Plaintiff was employed by the defendant in 1975 at a salary of $8,000 per year. As of 1980, plaintiff had received two promotions and was receiving $12,700 per year during the first part of that year. On July 1, 1980, she received her third promotion into a supervisory position and her salary was raised to $15,000 per year. It is inter-

esting to note that Stan Pearman, Director of Functional Accounting, suggested to plaintiff while she was a Grade 12 junior accountant that she might apply for one of the new positions. Also, plaintiff was recommended for that promotion from Grade 12 to Grade 14 by Dave Klosterman, Controller of the defendant company. It is also noteworthy that Judy Muncy, a white female, applied for the same position which Conley sought. Also of great significance is the fact that after plaintiff was discharged, her position was taken by another black female.

Although plaintiff had filed several claims of discrimination against the defendant company prior to her final promotion, each of those claims was denied by the appropriate state or federal agency as being based on no cause, with the exception of one she filed about the failure to receive maternity leave benefits, which the defendant later paid to her.

Plaintiff's personal problems basically arose in August and September of 1980. Plaintiff had as her section leaders two whites, Julie Happel and Judy Muncy. She also supervised eleven accounts payable clerks, eight of whom were white and three of whom were black. Plaintiff testified that Happel called her a "nigger" and used many other derogatory terms based on her race, and that she discussed these problems with Royer. Royer denied this. As late as October 1980, four employees under plaintiff's supervision, three of whom were black, requested Royer to set up a meeting with them, with Pearman and himself in order to discuss problems they were having with plaintiff's allegedly "dictatorial way of 'supervising' them." *See* Tr. Vol. II, pp 159–76.

In September 1980, an incident occurred concerning the payment of a bill on behalf of Colonel Sanders. The plaintiff complained stating that she was not allowed to reprimand the uncooperative and insubordinate section leaders, Muncy and Happel. When Royer was advised of the incident by plaintiff, he asked that she not reprimand Muncy and Happel; and he subsequently verbally reprimanded them both and advised them to cooperate more fully with plaintiff.

Following this incident, Jesse Coleman, a black who was Director of Employee Services for defendant, met with Royer, Pearman, plaintiff and Happel and talked about the apparent inability of plaintiff and Happel to work together. Plaintiff told Coleman that she would resort to physical force if necessary to run Happel off.

Finally, on November 5, 1980, a meeting was held between Coleman, Pearman, Klosterman, John Quirk, Vice President of Human Resources, and Michael McGraw, General Counsel for defendant. Coleman and the others present believed that Happel and plaintiff would not be able to work together, and they were both ordered to be transferred from the accounts payable department effective November 6, 1980. Plaintiff was transferred to a project-oriented position as a Senior Accountant, Special Projects, which was a non-supervisory position, but she retained her Grade 14 pay level.

During the three-day vacation which plaintiff took before taking her new position, her husband filed an action in Jefferson Circuit Court in her behalf claiming unlawful employment discrimination in violation of Kentucky Civil Rights Act, KRS 344.010, *et seq.* The state court entered its judgment denying plaintiff's request for a temporary injunction, finding there had been no unlawful employment discrimination.

Plaintiff reported on November 14, 1980 to George Kavorkian. Kavorkian had been a supervisor of plaintiff's between the period January 1979 and June 1980. Plaintiff was told by Kavorkian and Klosterman that she would be responsible primarily for the new Capital Monitoring Reports and would share responsibility with Dave Johnson for the Fixed Assets Cycle Inventory Program.

Plaintiff then began a pattern of irregular attendance which continued throughout the rest of her employment. She missed 10 days of work in November, 7 days of work

in December, 1980, and 3 days of work in January, 19 days of work in February, and 11 days of work in March, 1981. These absences caused considerable pressure to be exerted on Kavorkian, who had deadlines to meet but who rescheduled the deadlines as to both Dave Johnson and plaintiff. Plaintiff was allowed until January 31, 1981 to complete the report for the Oklahoma District Stores, the Chicago District Stores by February 15, 1981 and the Cincinnati District Stores by July 20, 1981. Plaintiff did not finish either the Chicago or Cincinnati reports and the Oklahoma work had to be redone by Dave Johnson.

By February 1981, Kavorkian had become so concerned about plaintiff's absences and the progress of the work to which plaintiff had been assigned that he wrote her several letters reflecting his concerns and frustration and requested medical substantiation of her absences. On March 17, 1981, plaintiff returned to work. That day Kavorkian met with her and discussed her responsibilities and provided her with a revised memorandum reflecting new schedule dates for the reports. Kavorkian and Dave Johnson reviewed with plaintiff 125 errors that she had made on the Cycle Inventory report and pointed out to her a store she had missed during the inventory check.

In addition, plaintiff had made errors on the Capital Monitoring Report which included failing to make adjustments for price variances in computing profit and loss statements. Price variance is an important factor. *See* defendant's Exhibit 30, Vol. VI, pp. 61–87, 141–143, 158–160. Also, her yearly profit averages for the stores were substantially inaccurate.

During the week after plaintiff's return to work, she continued to make the same mistakes that had been made on previous reports. *See* Vol. VI, pp. 114, 118, 120, 122. Kavorkian then determined that plaintiff should be terminated, but before doing so, met with Coleman, who concurred. The termination took place on March 24, 1981.

Plaintiff, in order to establish her charge of racial or sexual discrimination, must, under the principles enumerated in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), show that she belongs to a protected minority, that she was qualified for the job in which she was employed, that despite her qualifications she was discharged, and that other similarly situated employees not in the protected minority were not discharged for similar behavior. In the case at bar, plaintiff has failed to meet qualifications two and four of the *prima facie* qualifications. While she had been a competent employee prior to her transfer in 1980 under Kavorkian's supervision, she did not demonstrate her accounting qualifications after that transfer. In addition, she put no proof on to demonstrate that employees who committed similar errors were not discharged. She did produce testimony of one Nancy Kruer to the effect that Ms. Kruer was allowed to return to work after three months absence following hospitalization in Our Lady of Peace for emotional and mental problems.

The evidence as to Ms. Kruer did reflect that her work while she was absent was apparently done by other employees. The evidence in the case at bar reflects that while other employees did not do plaintiff's work for her in her absence, the cause for her discharge was not her absence per se but her accounting errors, coming as they did immediately after she had been allowed to return to work and after her prior errors had been discussed with her. It is also important to observe that when plaintiff was replaced, she was replaced by a black woman, certainly a circumstance which negates to some extent any charge of racial or sexual discrimination.

While we do not believe that plaintiff met the *prima facie* standards of *McDonnell Douglas Corp. v. Green*, *supra*, even if we are erroneous in that respect, we are of the opinion that defendant clearly articulated a legitimate reason for her discharge, and that plaintiff did not introduce any substantial evidence to show

that the articulated reasons were a pretext. *See Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

■ Plaintiff also complains that defendant retaliated against her in discharging her and in removing her from her supervisory position. 42 U.S.C. § 2000e, *et seq.,* prohibits employers from retaliating against employees because of their filing of administrative or other complaints concerning discrimination. The evidence reflects that plaintiff, on January 28, 1977, filed her first discrimination charge with the Kentucky Commission of Human Rights (KCHR). Four years after that retaliation charge, she had received three promotions and was earning a salary 75% more at that time than the salary she was earning at the time of the first charge.

■ While it is true that plaintiff did file a lawsuit on November 10, 1980 complaining of discrimination in her lateral transfer, she did not produce substantial evidence which would indicate that her discharge was connected with the lawsuit or with any of the prior claims that she had filed of discrimination. Under the statute, plaintiff must show that there was a causal connection between the protected activity, such as filing a discrimination charge or a lawsuit, and the adverse employment action. *See Burrus v. United Telephone Company of Kansas, Inc.,* 683 F.2d 339 (10th Cir.1982). *See also,* the learned discussion by District Judge Porter, Southern District of Ohio, in the case of *Sutton v. National Distillers Products Co.,* 445 F.Supp. 1319 (1978).

■ Plaintiff's claims under 42 U.S.C. § 1981 based on sex discrimination must be dismissed out-of-hand since the statute applies only to racial discrimination. As to the racial discrimination aspects of Counts II and III, plaintiff's evidence falls far short of showing intentional discrimination against her with reference to the employment actions which were taken prior to her termination. None of these employment actions has any racial aspects at all except for the Happel and Muncy incidents, which the Court has previously discussed, and which resulted in a decision made by management which was non-racial in its effect of transferring both the white employees and the plaintiff on a lateral basis from the same department.

We have this day entered our judgment dismissing the complaint of the plaintiff.