Susan McCARTHY, Plaintiff,

v.

CORTLAND COUNTY COMMUNITY ACTION PROGRAM, INC., Joyce Grant, Lucy Shutts, Louis Lansdowne, Brian Stanton, Etta Inman, Lila H. Heath, Adeline Higgins, Esther Twentyman, Russell Teeter, Charles Poskanzer, Laura Jones, Judy Bush, Sue Becker, Gloria Kreh, Delores Heller, Gary McMillen, Bea Dawkins and Marge Ostrander, Defendants.

No. 79–CV–740.

United States District Court, N. D. New York.

Feb. 14, 1980.

Ronald R. Benjamin, Binghamton, N. Y., for plaintiff.

Richard H. Sargent, Sargent, Sargent & Martin, Syracuse, N. Y., for defendants.

MUNSON, District Judge.

## MEMORANDUM–DECISION AND ORDER

Susan McCarthy is a community services worker who was employed by the Cortland County Community Action Program (CCCAP) from August of 1973 until November of 1979 when the agency's Board of Directors terminated her employment. Ms. McCarthy has commenced this Title VII action seeking immediate reinstatement through the issuance of a preliminary injunction, arguing that she had been discharged in retaliation for having previously filed sex discrimination charges against the agency. The agency and its board members have cross moved for dismissal, insisting that plaintiff cannot maintain this action until she has exhausted the conciliation procedures provided by the Act. In the event that this motion is denied, the defendants argue alternatively that plaintiff has failed to satisfy the prerequisites for granting preliminary injunctive relief and that, on balance, the equities tip decidedly in their favor.

## I.

In the present case, it is undisputed that, prior to filing her Complaint, plaintiff had not exhausted the administrative remedies provided by the Equal Employment Opportunity Act. The issue thus presented is whether an employee asserting a claim for retaliatory discharge may commence a Title VII action and demand reinstatement before the Commission issued a "right to sue" letter.

## A.

The procedures mandated by the Equal Employment Opportunity Act are designed to promote conflict resolution through conciliation rather than litigation.[1] *Weise v. Syracuse University*, 522 F.2d 397, 412 (2d Cir. 1975). Indeed, this Congressional objective is so significant that the courts have regarded compliance with these requirements as a jurisdictional prerequisite to the maintenance of a Title VII action. *United Airlines, Inc. v. Evans*, 431 U.S. 553, 555 n.4, 97 S.Ct. 1885, 1887, 52 L.Ed.2d 571 (1977); *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 47, 94 S.Ct. 1011, 1019, 39 L.Ed.2d 147 (1974); *International Union of Electrical Radio & Machine Workers v. Robbins & Meyers, Inc.*, 429 U.S. 229, 239–240, 97 S.Ct. 441, 448–449, 50 L.Ed.2d 427 (1976). The courts have, however, refused to exalt form over substance and have eschewed rigid construction of Title VII's procedural

1. When a discriminatory employment practice occurs in a state having a law which prohibits such practices (e. g., N.Y.Executive Law § 290 et seq.), an aggrieved person cannot file a charge with

the EEOC until 60 days have elapsed after the commencement of such state or local proceedings. 42 U.S.C. § 2000e–5(c). Resort to the EEOC thereafter is conditioned on the filing of charges not more than 300 days after the occurrence of the alleged unlawful practice or 30 days after the termination of state or local proceedings, whichever is earlier. 42 U.S.C. § 2000e–5(e). If, on the other hand, there is no such state or local law, charges may be filed directly with the EEOC, but the time period is reduced to 180 days from the date of the occurrence. *Id.* Once it receives a charge, the EEOC investigates; if it finds no reasonable cause to believe that the charge is true, it dismisses the charge, but if it finds reasonable cause it attempts conciliation. 42 U.S.C. § 2000e–5(b). If conciliation fails, the Commission can institute a civil action against the respondent. 42 U.S.C. § 2000e–5(f)(1). If the EEOC dismisses the charge, or if within 180 days after filing the Commission has neither effected conciliation nor instituted a civil action, it is to notify the aggrieved party, who has 90 days after the giving of such notice to commence an individual civil action.

mandates when strict insistence upon technical compliance would defeat the fundamental purpose of the Act, i. e., ensuring that employment discrimination is redressed. *Love v. Pullman Co.*, 404 U.S. 522, 527, 92 S.Ct. 616, 619, 30 L.Ed.2d 679 (1972); *Silver v. Mohasco Corp.*, 602 F.2d 1083, 1087 (2d Cir. 1979); *Weise v. Syracuse University, supra*, at 412; *Voutsis v. Union Carbide Corp.*, 452 F.2d 889, 892 (2d Cir.), *cert. denied*, 406 U.S. 918, 92 S.Ct. 1768, 32 L.Ed.2d 117 (1972).

As the defendants' brief correctly recites, some district courts have attached greater significance to Title VII's procedural requirements than to its fundamental purpose and have accepted the argument that until a right to sue letter has been issued, Title VII confers no jurisdiction to preliminarily enjoin a retaliatory termination. *McGee v. Purolator Courier Corp.*, 430 F.Supp. 1285 (N.D.Ala.1977); *Berg v. LaCrosse Cooler Co.*, 13 F.E.P. 783 (W.D.Wis.), *app'l dism'd as moot*, 548 F.2d 211 (7th Cir. 1977); *Gellman v. State of Maryland*, 12 F.E.P. 1804 (D.Md.1975); *Collins v. Southwestern Bell Telephone Co.*, 376 F.Supp. 979 (E.D.Okl. 1974); *Troy v. Shell Oil Co.*, 378 F.Supp. 1042 (E.D.Mich.1974), *app'l dism'd*, 519 F.2d 403 (6th Cir. 1975); *see also Jerome v. Viviano*, 489 F.2d 965, 966 (6th Cir. 1974). These cases generally begin by recognizing that Congress specifically authorized the Commission to seek preliminary injunctive relief. 42 U.S.C. § 2000e–5(f)(2). From the absence of a parallel provision authorizing private parties to invoke F.R.Civ.P. 65, the courts then infer that Congress intended to foreclose this remedy. *Berg v. LaCrosse Cooler Co., supra; Gellman v. State of Maryland, supra; Collins v. Southwestern Bell Telephone Co., supra; Troy v. Shell Oil Co., supra.* The opinions also emphasize

that a contrary holding would emasculate the conciliation requirements of Title VII (see, e. g., *Jerome v. Viviano, supra*) and transcend established principles requiring exhaustion of administrative remedies. *Troy v. Shell Oil Co., supra.*

The rationale of the preceding cases has not, however, been uniformly adopted, and other courts have accepted jurisdiction over actions seeking preliminary reinstatement even though a "right to sue" letter had not been issued. *Drew v. Liberty Mutual Insurance Co.*, 480 F.2d 69 (5th Cir.), *cert. denied*, 417 U.S. 935, 94 S.Ct. 2650, 41 L.Ed.2d 239 (1974) is perhaps the leading case in this line of authority. There, the court recognized that compliance with Title VII's conciliation procedures might be unrealistic in some retaliatory discharge cases,[2] and concluded that since a private litigant could seek preliminary injunctive relief prior to 1972 when this remedy was extended to the Equal Employment Opportunity Commission, a fortiori, Congress anticipated that private plaintiffs would continue to seek preliminary relief under F.R. Civ.P. 65. *Id.* at 72–74. Other courts have since reached the same conclusion, refusing to frustrate the fundamental purpose of Title VII through strict adherence to the Act's procedural formalities—provided that plaintiff can demonstrate irreparable harm and probable success in ultimately proving the retaliatory discharge claim. *McNail v. Amalgamated Meat Cutters and Butcher Workmen*, 549 F.2d 538, 542 n.10 (8th Cir. 1977); *Berg v. Richmond Unified School District*, 528 F.2d 1208 (9th Cir.) *vacated and remanded on other grounds*, 434 U.S. 158, 98 S.Ct. 623, 54 L.Ed.2d 375 (1977); *Eldredge v. Carpenters Local 46*, 440 F.Supp. 506, 516 (N.D.Cal.1977).[3]

---

**2.** Some courts have taken cognizance of an arguably premature Title VII action if requiring exhaustion would have been futile either because the EEOC had stated that it would not reach the charge (*Vanguard Justice Society, Inc. v. Hughes*, 471 F.Supp. 670, 686 (D.Md. 1979); *Lewis v. Ford Motor Co.*, 11 F.E.P. 31 (N.D.Cal.1975) or conciliation had proved fruitless in the prosecution of a prior and related charge (*Weise v. Syracuse University*, 522 F.2d

397, 411–413 (2d Cir. 1975). Plaintiff has, however, failed to establish the applicability of either exception in this case.

**3.** Since exhaustion is treated as a "jurisdictional" prerequisite in the Title VII context, the Second Circuit will consider it sua sponte, even if it has not been raised by the parties. *Gresham v. Chambers*, 501 F.2d 687, 690 (2d Cir. 1974). Thus, inasmuch as the court never addressed this issue in reviewing Judge Duffy's

338

## B.

■ Congress enacted Title VII to assure equality of employment opportunities by eliminating discrimination on the basis of race, color, sex, national origin or religious conviction. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 800, 93 S.Ct. 1817, 1823, 36 L.Ed.2d 668 (1973); *Griggs v. Duke Power Co.*, 401 U.S. 424, 429–431, 91 S.Ct. 849, 852–853, 28 L.Ed.2d 158 (1971). Voluntary compliance and cooperation were seen as the preferred means of achieving this goal. *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 44, 94 S.Ct. 1011, 1017, 39 L.Ed.2d 147 (1974). The exhaustion requirement has thus been imposed to ensure that discrimination will be eliminated in the manner envisioned by Congress. Nevertheless, the national interest in eliminating discrimination will, at times, justify departure from strict insistence upon voluntary compliance.

As originally enacted, Title VII created the Equal Employment Opportunity Commission and established procedures whereby existing state and local equal employment agencies could be utilized to settle disputes through conference and conciliation. Congress thus mandated resort to these procedures before a party was permitted to commence judicial proceedings to enforce his rights. The EEOC was not, however, vested with standing to seek judicial review in its own right.

■ The Act was then amended in 1972 to, among other things, provide the Commission with additional investigative authority and vest it with standing to institute civil actions against employers or unions once the usual conciliatory procedures had been exhausted. Because the 1972 amendments specifically authorized the EEOC to seek preliminary injunctive relief before the conciliation process has been completed, some courts have concluded that Congress necessarily meant to bar private litigants from seeking interim equitable re-

lief. *Berg v. LaCrosse Cooler Co., supra; Gellman v. State of Maryland, supra; Collins v. Southwestern Bell Telephone Co., supra; Troy v. Shell Oil Co., supra.* Interestingly enough, no specific reference to the legislative history contemplates such an interpretation. Furthermore, in view of the fact that the 91st Congress was attempting to catalogue the EEOC's newly created authority to pursue judicial enforcement, it is hardly surprising that it specifically authorized resort to preliminary injunctive relief—a remedy which had always been available to private litigants. It is therefore difficult to appreciate how a congressional effort to define the scope of the Commission's newly enacted powers could fairly be construed as an implied repeal of remedies which had theretofore been available to private litigants, particularly since repeals by implication are not favored and will not be assumed absent a clear manifestation of legislative intent. *Posadas v. National City Bank*, 296 U.S. 497, 503, 56 S.Ct. 349, 352, 80 L.Ed. 351 (1936).

Another troublesome aspect of cases requiring exhaustion by a Title VII plaintiff seeking preliminary injunctive relief in a retaliatory discharge case is the fact that by imposing this requirement, the Court may be encouraging employers to profit from their unlawful action by using the discharge as an "example" to intimidate other employees who might press similar claims or assist the EEOC in its investigation. Likewise, strict reliance upon Commission enforcement will permit employers to exploit the agency's backlog in furtherance of their illegal ends. Thus, in certain circumstances, there are sound policy reasons for allowing a discharged employee to seek preliminary reinstatement even though the usual conciliatory procedures of Title VII have not been exhausted.

## C.

■ As noted earlier, this circuit has consistently eschewed rigid interpretations of

denial of a Title VII plaintiff's application for preliminary reinstatement, *Faro v. New York University*, 502 F.2d 1229 (2d Cir. 1974), one could reasonably assume that the Second Cir-

cuit would not regard exhaustion as an absolute jurisdictional barrier to preliminary relief under Title VII.

Title VII's procedural mandates when insistence upon strict compliance would defeat the fundamental purposes of the Act. *Silver v. Mohasco Corp.*, 602 F.2d 1083, 1087 (2d Cir. 1979); *Egelston v. State University College at Geneseo*, 535 F.2d 752, 753–755 (2d Cir. 1976); *Weise v. Syracuse University*, 522 F.2d at 412; *Voutsis v. Union Carbide Corp.*, 452 F.2d at 889. The purpose of the exhaustion requirement is ostensibly to permit the employer to investigate the charge and to allow the Commission to facilitate voluntary reconciliation. *Weise v. Syracuse University*, 522 F.2d at 412. However, by demonstrating probable success in a retaliatory discharge case, plaintiff will necessarily establish employer animus. As a practical matter, it will then be quite unlikely that the employer would investigate the charge with an eye toward conciliation. By showing probable success, plaintiff will also demonstrate that he or she will eventually receive a "right to sue" letter, at which time the Complaint can simply be amended to include compliance with these procedures. See *Weise v. Syracuse University*, 522 F.2d at 413. In cases involving a retaliatory discharge, it is therefore clear that the substantive purposes of Title VII, i. e., the elimination of discrimination through voluntary means, can best be realized by allowing an employee to seek preliminary reinstatement without regard to Title VII's usual exhaustion requirements, provided that the aggrieved party can demonstrate irreparable harm and probable success in showing that his employment was terminated because he had invoked the protection of the Act.

Accordingly, this court joins the Fifth, Eighth, and Ninth Circuits in holding that subject matter jurisdiction may properly be invoked under Title VII in cases involving a retaliatory discharge, without exhaustion of the usual conciliation procedures, if the plaintiff demonstrates irreparable harm and probable success on the merits.[4]

## II.

Having determined that this court may, in limited circumstances, preliminarily enjoin a retaliatory discharge without regard to the usual exhaustion requirements of Title VII, the analysis now shifts to an assessment of whether plaintiff has shown irreparable harm and probable success on the merits of her claim.

## A.

The standard of proof established for instances of employment discrimination (*McDonnell-Douglas Corp. v. Green*, 411 U.S. 792, 802–803, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973)) is equally applicable in retaliatory discharge cases. See *Corley v. Jackson Police Department*, 566 F.2d 994, 999 (5th Cir. 1978); *Smith v. Union Oil Co.*, 17 F.E.P. 960, 995–996 (N.D.Cal.1977). Thus, to establish probable success in an action brought pursuant to 42 U.S.C. § 2000e–3, plaintiff initially bears the burden of making a prima facie showing that her discharge was in retaliation for having opposed the defendants' alleged sex discrimination and having failed a Complaint

4. In other cases involving applications for preliminary injunctive relief, the Second Circuit has adopted an alternative formulation now known as the "Sonesta" test. *Sonesta International Hotels Corp. v. Wellington Associates*, 483 F.2d 247, 250 (2d Cir. 1973). Thus, preliminary injunctive relief is usually available in this circuit if plaintiff demonstrates irreparable harm and either (a) probable success on the merits, or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardship tipping decidedly in favor of the moving party. *Caulfield v. Board of Education of the City of New York*, 583 F.2d 605, 610 (2d Cir. 1978). The Ninth Circuit has adopted a similar mode of

analysis. *William Inglis & Sons Baking Co. v. ITT Continental Baking Co.*, 526 F.2d 86, 88 (9th Cir. 1975). However, in *Berg v. Richmond Unified School District, supra*, it held that Title VII's usual exhaustion requirements could be foregone only if plaintiff established her probable success on the merits. The Court did not suggest that deviation from Title VII's exhaustion requirements would be permissible if plaintiff had merely shown sufficiently serious questions to make them a fair ground for litigation, probably because the policies which favor relaxation of the usual exhaustion requirements presuppose a probable violation of the Act.

with the EEOC. Once this threshold showing has been made, the burden of proof shifts to the employer who must come forward with a legitimate and nondiscriminatory explanation for its conduct. Plaintiff is then free to offer rebuttal evidence in an effort to show that the defendants' purported justification was a pretext.

Evidence presented to this Court during a hearing on plaintiff's application for preliminary injunctive relief has shown that on October 23, 1979, Ms. McCarthy held a press conference with her attorney to denounce the Cortland County Community Action Program for failing to investigate and correct her earlier charges of sex discrimination. At the press conference, plaintiff also announced her intention to refile discrimination charges with the EEOC. The evidence clearly established that the defendants learned of these statements shortly after the press conference; and, on November 1, 1979, the agency's Board of Directors voted to immediately terminate plaintiff's employment.

■ Plaintiff may establish a prima facie case under 42 U.S.C. § 2000e–3 by showing that she was discharged following protected activities of which her employer was aware, *Aguirre v. Chula Vista Sanitary Service*, 542 F.2d 779, 781 (9th Cir. 1976); *Falkowski v. Perry*, 464 F.Supp. 1016, 1020 (N.D.Ala.1978); *Macey v. World Airways, Inc.*, 14 F.E.P. 1426, 1430 (N.D.Cal.1977), provided that the dismissal occurs soon enough after the protected activity that a causal relationship could reasonably be inferred. Compare *Mills v. National Distillers Products Co.*, 17 F.E.P. 73, 77 (S.D.Ohio 1978). Since plaintiff's discharge in this case occurred just two weeks after the press conference and approximately one week after she filed sex discrimination charges with the EEOC, the Court is satisfied that Ms. McCarthy has established a prima facie case under 42 U.S.C. § 2000e–3. However, as explained in the next section of this opinion, the defendants have been equally successful in demonstrating a legitimate and nondiscriminatory justification for plaintiff's termination.

## B.

■ To appreciate the legitimacy and extent of the defendants' justification for terminating plaintiff's employment, it is necessary to examine the history of plaintiff's role and participation in the Cortland County Community Action Program.

Plaintiff was hired in August of 1973 as a consumer advocate. In 1974 she was appointed Director of Community Services—a position which she held until her termination. As the Director of Community Services, plaintiff was one of six department heads who were under the supervision of the Executive Director. In 1975, Reuben Dworsky was appointed as the agency's Executive Director. Plaintiff initially developed an acceptable working relationship with Mr. Dworsky, however, their ability to work together gradually deteriorated and, by the early part of 1979, communication between these individuals had almost completely broken down. Their personality conflicts had become exaggerated, and plaintiff refused to accept and abide by the agency's organizational structure—continually challenging the Executive Director's authority.

During the Spring of 1979, the Executive Director attempted to schedule meetings with Ms. McCarthy at which these conflicts could be resolved. Plaintiff, however, assiduously avoided participating in such discussions. As a result, the working relationship between the parties continued to deteriorate and, on May 2, 1979, plaintiff filed her first internal sex discrimination charge, alleging that the Executive Director was unable to work with any woman and had singled her out as a target for discriminatory treatment. Viewed in the matrix of the preceding events, it is therefore clear that plaintiff's initial charge was primarily an attempt to justify her personal animosity toward the Executive Director—a fact which was made especially evident by her admission that she recommended the Executive Director's resignation to several individuals who were investigating her allegations.

Ms. McCarthy's initial charge was investigated by the community action program's "equal opportunity officer" who concluded that her representations were entirely unfounded. On May 31st the Community Services Administration announced that it concurred with this determination, and, three days later, plaintiff renewed her complaint by petitioning CCCAP's Equal Employment Opportunity Committee to continue the investigation of her charges. The agency's Equal Employment Opportunity Committee then informed plaintiff that it would meet at 5:00 p. m. on July 9, 1979, to reconsider her charges. However, because Ms. McCarthy refused to attend, the meeting was adjourned until July 16, 1979. Nevertheless, despite notification of this adjournment, plaintiff again failed to attend the meeting.

Despite plaintiff's obvious unwillingness to pursue her allegations, the agency's Equal Employment Opportunity Committee scheduled still another meeting in an effort to resolve the controversy once and for all. This meeting was scheduled for August 13, 1979. Plaintiff was again invited to attend, with counsel and present any evidence that would assist the Committee in fairly evaluating her grievance. Unfortunately, neither plaintiff nor her attorney responded to the Equal Employment Opportunity Committee's invitation, nor did either of them attend the August 13th meeting. Hence, it is not surprising that after adjourning its deliberations three times to give plaintiff an opportunity to present her grievance, the Committee finally considered the written materials which she had submitted, albeit without the benefit of her comments.

At its August 13th meeting, the Committee resolved that it would make two recommendations to the agency's Board of Directors: (1) that Ms. McCarthy's grievance be dismissed; and (2) that the Executive Director be instructed to terminate plaintiff's employment as a result of her inability to accept and work within the organizational format of the Cortland County Community Action Program.

On August 20, 1979, Ms. McCarthy and her attorney were notified of the Equal Employment Opportunity Committee's recommendations and were informed that the Board of Directors would consider them at their next scheduled meeting on September 6, 1979. Plaintiff and her attorney were again invited to present specific and concrete proof to assist the agency in identifying the alleged sex discrimination. Ms. McCarthy was also asked to respond to the Committee's recommendation that she be discharged.

At long last, plaintiff finally attended one of the defendant's meetings, at which time the Board heard from Ms. McCarthy, her attorney, and the Executive Director. In a remarkable gesture of good faith, the Board of Directors then determined that it would attempt to facilitate a reconciliation between plaintiff and the Executive Director by endorsing a vote of confidence for both individuals, requesting that each of them cooperate with the other, and establishing an ad hoc committee to investigate plaintiff's charges of sex discrimination.[5] The Board hoped that by creating a "cooling off period" it could resolve this personnel problem without further crippling the agency's performance.

Despite the Board's good faith efforts to effect a reconciliation between plaintiff and the Executive Director, in less than twenty-four hours, Mr. Dworsky called Ms. McCarthy into his office, where he expressed his long felt animosity toward her.[6] It then became apparent that the Board's well in-

5. Although the plaintiff boasts in her memorandum that the Board of Directors had commended her for the "splendid" job that she was doing, I find no evidence that the Board would have characterized her performance in this manner. Indeed, it is the Court's opinion that the performance by Ms. McCarthy and Mr. Dworsky was a disgrace to the human service professions.

6. I find the testimony of Ms. McCarthy and Mr. Dworsky so tainted with hatred and vindictiveness that I can accept neither witness' version of the events which transpired during this meeting.

tentioned efforts were doomed to failure. Worse yet, plaintiff failed to cooperate with the ad hoc investigating team, either personally or through counsel, and failed to submit any additional information concerning her charges of sex discrimination.

Following the September 9th Board meeting, Ms. McCarthy's work became progressively less productive. Although she had apparently experienced difficulty in relating to some of the volunteer workers in the past, she became increasingly critical of them, causing alienation and failing to provide effective management of this critical resource. Furthermore, she abandoned one of her primary responsibilities by closing the Clothing Referral Center. While this action was ostensibly taken to permit Ms. McCarthy to make Christmas toys, one experienced community services worker testified that both of these projects could have, and should have, been undertaken at the same time. Finally, on October 23, 1979, without cooperating with the ad hoc investigating team and before that committee had submitted its report, plaintiff held a press conference and again thrust her sex discrimination charges into the public spotlight. Needless to say, many community members serving on the agency's Board of Directors felt betrayed and disappointed by this self-serving attack.

Six days after the press conference, the CCCAP Personnel Committee met to receive the ad hoc committee report and to consider the course to be followed in resolving the controversy. They learned that the independent investigating team had, like the Equal Employment Opportunity Committee and the Community Services Administration, found no basis for the claimed discrimination. Having concluded that Ms. McCarthy's sex discrimination charges were unfounded, the Committee then reviewed the entire history of plaintiff's employment and determined that she had become simply unwilling or unable to abide the organizational format of the agency and could not accept the authority of the Executive Director. The Personnel Committee also concluded that plaintiff had become overbearing and ungrateful toward the volunteer workers upon whom the agency so heavily relies to perform its community services functions. Indeed, her very presence was seen as provoking antagonism and division within the agency. Consequently, as a result of plaintiff's proven inability to accept the Executive Director's authority, follow agency procedure, treat her colleagues with respect, and effectively manage the programs which had been entrusted to her supervision, the Personnel Committee recommended that the Board of Directors adopt a resolution dismissing Ms. McCarthy from her employment.

Plaintiff was informed of this decision, and, on November 1, 1979, the CCCAP Board of Directors met to consider the Personnel Committee's recommendation. At this time, the Board heard from Mr. Dworsky and Ms. McCarthy concerning the events which had led to months of turmoil within the agency. A vote was then taken, and it was determined that plaintiff would be discharged because her personality conflict with the Executive Director had so preoccupied the entire agency that neither she nor CCCAP could effectively serve the needs of the community.

## C.

Judicial opinions have differed concerning whether an employer's justification for discharging an employee must be entirely free from retaliatory motive. One court has, by analogy, adopted the test established in *Mount Healthy Board of Education v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977), stating that the relevant inquiry is whether plaintiff would have been discharged if he or she had not engaged in protected activity. *Sutton v. National Distillers Products Co.*, 445 F.Supp. 1319, 1327–28 (S.D.Ohio 1978). Other courts have held that an employee's discharge should be invalidated if retaliation played any part in the dismissal, i. e., another sufficient cause does not remove the issue. *Kornbluh v. Stearns & Foster Co.*, 73 F.R.D. 307, 312 (S.D.Ohio 1976); *Mead v. United States Fidelity & Guaran-*

*tee Co.*, 442 F.Supp. 114, 131 (D.Minn.1977); *Falkowski v. Perry*, 464 F.Supp. 1016, 1020 (N.D.Ala.1978). It is, however, unnecessary to decide which rule more accurately states the standard for liability as the evidence presented in this case has shown that plaintiff was not dismissed in retaliation for the sex discrimination charges which she had filed or pursued. Rather, her sex discrimination charges were apparently a pretext for her own inability to resolve personality and authority conflicts which had developed within the agency's administration. The Board of Directors was thus confronted with a difficult management decision and, although the best long term solution might have been to dismiss plaintiff and the Executive Director, the Board in its wisdom elected only to dismiss plaintiff.

That this decision was not provoked by plaintiff's sex discrimination charges is perhaps best illustrated by plaintiff's own cross-examination of Etta Inman, the defendant's president, who testified that the Personnel Committee would have recommended Ms. McCarthy's dismissal in October of 1979, regardless of whether the ad hoc investigating team had found evidence to substantiate plaintiff's charges of sex discrimination. Thus, considering the credible testimony and the totality of the documentary evidence presented to this court, it is clear that plaintiff's allegations of sexual discrimination in no real sense caused or contributed to her discharge.

#### D.

Plaintiff's feeble attempt to rebut the defendants' justification was wholly inadequate to the task. For example, she offered no proof that other employees with similar problems had not been discharged, nor did she present any evidence that other employees who had filed sex discrimination charges were either disciplined or discharged. Likewise, she presented no documentary evidence which would fairly establish that the defendants' asserted justifications were a mere pretext for an otherwise retaliatory discharge.

Accordingly, plaintiff has failed to demonstrate a probable success on the merits of her retaliatory discharge claim. The proof is therefore inadequate to warrant departure from the usual rule requiring exhaustion of Title VII's conciliatory procedures as a condition precedent to invoking the jurisdiction conferred by the Act and plaintiff's first cause of action cannot serve as a predicate for granting preliminary injunctive relief.

#### III.

Plaintiff's second cause of action asserts that she was denied due process as a result of having been terminated without being given notice and an opportunity to be heard. However, even assuming that the CCCAP is a "person" within the meaning of 42 U.S.C. § 1983, and that each of the defendants was acting under color of state law at the time of her dismissal,[7] Ms. McCarthy has still failed to present sufficiently serious questions going to the merits of her second cause of action to make them a fair ground for litigation.[8]

The Fourteenth Amendment bars the states from depriving any individual of liberty or property without "due process of law." A property interest in employment can be created only when an individual possesses "a legitimate claim to entitlement to [continued job tenure]." *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). State law is the primary source of such rights; however, a long standing pattern of practice may establish an individual's entitlement to a particular government benefit. *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 447 (2d Cir. 1980).

7. See *Janusaitis v. Middlebury Volunteer Fire Department*, 607 F.2d 17, 22–24 (2d Cir. 1979).

8. Since this claim is asserted under 42 U.S.C. § 1983, the exhaustion requirements of Title VII are inapplicable. See *Johnson v. Railway Express Agency*, 421 U.S. 454, 459–460, 95 S.Ct. 1716, 1719–1720, 44 L.Ed.2d 295 (1975); *Gresham v. Chambers*, 501 F.2d 687, 691 (2d Cir. 1974).

**344**

Plaintiff has not shown any evidence of a "long standing pattern or practice" which might arguably give rise to a legitimate expectation in continued employment by the agency. Nor has she shown that her contract of employment had explicitly been established for a fixed duration. As such, her employment was terminable at will and she had no property interest in continued employment as to which the procedural safeguards of the Fourteenth Amendment could attach. *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d at 448.

 Plaintiff also contends that the reasons given for her discharge have stigmatized her and damaged her reputation in the community. This, of course, might constitute a constitutional violation, as it is well recognized that an individuals' protected "liberty" interest can be implicated when a governmentally imposed stigma restricts her ability to seek and obtain employment. *Quinn v. Syracuse Model Neighborhood Corp., supra* at 446.

 To constitute a deprivation of "liberty" within the meaning of the Fourteenth Amendment, the stigmatizing information must be false and made public by the offending governmental entity during the course of the employment termination. *Paul v. Davis*, 424 U.S. 693, 710, 96 S.Ct. 1155, 1164, 47 L.Ed.2d 405 (1976); *Gentile v. Wallen*, 562 F.2d 193, 197 (2d Cir. 1977); *Quinn v. Syracuse Model Neighborhood Corp., id.* However, to be "stigmatizing", the information relied upon to support the discharge must "call into question the plaintiff's 'good name, reputation, honor, or integrity'." *Quinn v. Syracuse Model Neighborhood Corp., id.* at 446, quoting *Roth v. Board of Regents*, 408 U.S. at 573, 92 S.Ct. at 2707. If the broadest conceivable interpretation of this language was adopted, it might be argued that the Executive Director's explication of the Board's reasons

for discharging plaintiff could, in some limited manner, be regarded as "stigmatizing." However, even assuming this to be a proper characterization of the allegations recited in the letter discharging plaintiff, she has failed to demonstrate that these justifications were either pretextual or untrue. Furthermore, insofar as the defendants in each instance considered the propriety of plaintiff's continued employment in executive session, i. e., in private, plaintiff has also failed to prove that the allegations surrounding her discharge were ever made "public." Compare *Codd v. Velger*, 429 U.S. 624, 628, 97 S.Ct. 882, 884, 51 L.Ed.2d 92 (1977); *Bishop v. Wood*, 426 U.S. 341, 348, 96 S.Ct. 2074, 2079, 48 L.Ed.2d 684 (1976); *Gentile v. Wallen*, 562 F.2d 193, 197–98 (2d Cir. 1977). Indeed, plaintiff was apparently the only one who attempted to create any sort of public "impression" concerning her discharge. For these reasons, she has failed to show sufficiently serious questions going to the merits of her second cause of action to make it a fair ground for litigation.

Resort to the conciliatory procedures specified by Title VII of the 1964 Civil Rights Act is ordinarily regarded as a condition precedent to invoking its jurisdictional provisions. Since plaintiff has failed to demonstrate probable success on the merits of her retaliatory discharge claim, her failure to exhaust these avenues of recourse requires that her first cause of action be dismissed. However, because she is presently pursuing these remedies, the defendants' motion to dismiss shall be granted only if, within twenty days after receiving her "right to sue" letter, Ms. McCarthy fails to amend her Complaint to allege exhaustion of these procedures. Lastly, inasmuch as plaintiff has failed to demonstrate that her second cause of action constitutes a fair ground for litigation, it is unnecessary to balance the countervailing equities,[9] and

9. Parenthetically, it deserves mention that, at least in commercial contexts, the Second Circuit has consistently refused to characterize an injury as "irreparable" if a litigant could recover monetary damages which would adequately compensate the loss. *Jackson Dairy, Inc. v. H.*

*P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir. 1979); *Studebaker Corp. v. Gittlin*, 360 F.2d 692, 698 (2d Cir. 1966); *Foundry Services, Inc. v. Beneflux Corp.*, 206 F.2d 214, 216 (2d Cir. 1948). Some courts have applied this rule in the context of Title VII litigation, holding that

plaintiff's demand for preliminary injunctive relief must, in all respects, be denied.

It is so ordered.

irreparable harm cannot be established where plaintiff would be entitled to backpay, *Jerome v. Viviano Food Co., Inc.*, 489 F.2d 965, 966 (6th Cir. 1974), at least if plaintiff fails to show a substantial likelihood of success on the merits. *Ekanem v. Health & Hospital Corp. of Marion City*, 589 F.2d 316, 321 (7th Cir. 1978). However, given the importance and noncompensable character of the public interest in eliminating discrimination, it would seem appropriate to presuppose the existence of irreparable harm once a plaintiff has shown probable success in proving a violation of 42 U.S.C. § 2000e–3 or facts indicating that, due to misconduct by the employer, a fair investigation of the alleged discrimination could not be undertaken as a result of the discharge.