Charles D. MELCHI, Plaintiff,

v.

BURNS INTERNATIONAL SECURITY
SERVICES, INC., Defendant.

Civ. No. 82–10014.

United States District Court,
E.D. Michigan, N.D.

Jan. 20, 1984.

Robert A. Hahn, Midland, · Mich., for plaintiff.

Gary E. Murg, Sally Akan, Nancy S. Katz, Detroit, Mich., for defendant.

## MEMORANDUM OPINION AND ORDER

JAMES HARVEY, District Judge.

Plaintiff brought this action under the Michigan "Whistleblowers' Protection Act", M.C.L. § 15.361 *et seq,* seeking both legal and equitable relief from the defendant Burns International Security Services Inc. (hereinafter "Burns" or "the Company"), for allegedly discharging him in an unlawful manner. Plaintiff claims that he was fired in retaliation for writing a letter to various public officials and agencies purportedly revealing violations of laws and/or regulations by Burns.

This claim was tried to the Court sitting without a jury. At the conclusion of trial, the parties submitted their requests for findings of fact and conclusions of law. Having considered the pleadings, testimony, and documents admitted in evidence, the Court makes the following findings of fact and conclusions of law pursuant to F.R.Civ.P. 52(a).

## FINDINGS OF FACT

1.) Plaintiff Charles Melchi worked for Burns Security from September 1, 1978, until he was fired on November 5, 1981.

During his employment, Burns Security was under contract with the Consumers Power Company of Michigan (CPC) to provide security services during the construction and operating phases of CPC's nuclear power facility in Midland, Michigan.

Originally hired as a member of the guard force, plaintiff was promoted in April, 1980, to the position of sergeant which he held until January, 1981. Plaintiff was then promoted to the position of shift lieutenant. As a shift lieutenant plaintiff supervised approximately twelve guards and the main gate sergeant. Along with additional supervisory responsibilities, this promotion removed plaintiff from the bargaining unit and placed him in management ranks.

2.) On February 2, 1980, while still a guard, plaintiff received a 12-month evaluation. Plaintiff's overall performance was rated "above average."

3.) In May of 1981, following his promotion to shift lieutenant, plaintiff's performance was again evaluated. Captain James R. Bradshaw, the Midland Site Commander and plaintiff's immediate supervisor, conducted the appraisal and rated plaintiff's overall performance "above average." Captain Bradshaw noted however, that "Chuck has been slightly erratic in the performance of his duties ... [and] has made less than adequate judgment on a few occasions—more experience will be helpful."

4.) In July, 1981, Burns' non-nuclear operations manager, Gerald Bradshaw,[1] met with plaintiff to discuss his performance as a lieutenant. Specifically, plaintiff was reprimanded concerning an incident where he had permitted a guard on duty to leave the premises to cash a paycheck, and ordered another guard to cover for him.[2] Bradshaw also explained that the Company was troubled by allegations that the plaintiff had breached the confidentiality of managerial discussions.

According to Bradshaw, plaintiff was further cautioned about his personal relationships with some of the guards. Apparently, the Burns' management was concerned that plaintiff's off-duty socializing with the guard force was interfering with his ability to be an effective supervisor. Plaintiff was warned that if his performance did not improve he could be demoted to sergeant or guard.

5.) Some time between October 16 and October 19, 1981, Captain James Bradshaw became aware of two other incidents involving plaintiff's actions as a lieutenant. Captain Bradshaw was advised that plaintiff had prepared an employment reference for a Burns employee to the Babcock & Wilcox Construction Company, one of the contractors on the Midland site. Bradshaw was also advised that plaintiff had found the main gate sergeant asleep on duty and had failed to report this to the Company.

6.) Although Captain Bradshaw was admittedly aware of these incidents, he did not attempt to contact the plaintiff. Indeed, prior to October 25, 1981, Bradshaw did not, in any manner, bring these alleged violations of company policy to the plaintiff's attention.

7.) On October 25, 1981, the plaintiff asked Bradshaw to accompany him in a Burns vehicle while he made his rounds. Bradshaw agreed, and as he made his rounds, plaintiff explained that he had heard rumors circulating among the guard force that Bradshaw was disappointed with plaintiff's performance and was contemplating his discharge. Bradshaw explained to plaintiff that he should not pay so much attention to rumors among the guards and that if he wanted to fire plaintiff, he would have done so in connection with plaintiff's prior actions. Plaintiff was again admonished for his off-duty contacts with union employees (guards and sergeants), and specifically for his decision to maintain guard Mapes as a roommate despite plaintiff's promotion to a management position. Captain Bradshaw believed that plaintiff's

---

1. Gerald Bradshaw is the father of Captain James Bradshaw, the Midland Site Commander.

2. The guard involved in this incident was John Mapes, who at the time was plaintiff's roommate.

work performance and evaluations would improve if he was not living with a member of the guard force.

8.) During this conversation, Captain Bradshaw asked plaintiff if he had written a letter of reference for a Burns employee to the Babcock & Wilcox Construction Company. Plaintiff answered that he had not. Bradshaw then asked plaintiff if he had ever found the main gate sergeant asleep on duty. Plaintiff again answered that he had not.

9.) During trial plaintiff testified that although he had indeed prepared an employment reference, he submitted the reference to a college placement office on forms submitted by the college. Plaintiff indicated that he did not realize the reference had been forwarded to Babcock & Wilcox. Thus plaintiff believed his answer to Captain Bradshaw was truthful since he had not prepared or sent a reference to Babcock & Wilcox and at the time of Bradshaw's questioning was not aware the reference had been sent to Babcock & Wilcox. As to the sleeping incident, plaintiff denied that he had ever observed the main gate sergeant asleep on duty.

10.) Although the Company's stated reasons for firing plaintiff was "lying ... and below standard performance" the Court makes no finding as to whether plaintiff lied to Captain Bradshaw. As will become clear in the Court's conclusions of law, such a determination is not necessary to the resolution of this lawsuit.

11.) Following his conversation with Captain Bradshaw, plaintiff returned to his duties. Later in the evening of October 25, or in the early morning hours of October 26, plaintiff prepared and sent the following letter to Captain Bradshaw:

Dear Capt. Bradshaw,

In regards to our conversation of the evening of the 25 Oct. 81, I feel I must make official my request for voluntary demotion to the rank of sergeant or guard. If being a part of management means that Burns can dictate who I can or cannot share living quarters with, and who I can and cannot socialize with during my off hours, then the price of being a part of management is too high. If my request for demotion is granted, I will strive to do the same good job that the sergeant and guard appraisals indicate I can do. This request in no way dampens my desire to be a part of the nuclear guard force. I hope you consider my request favorably. Thank you.

Sincerely yours,

/s/

Charles D. Melchi II

P.S. I respectfully request a copy of this be placed in my employment file.

12.) On Wednesday, October 28, 1981, plaintiff wrote the letter that he claims prompted his discharge. The letter was addressed and sent to the National Labor Relations Board and was copied to the Attorney General of the State of Michigan, Senator Carl Levin, Rep. Donald Albosta, the Nuclear Regulatory Commission, the Consumers Power Company and Donald Zastrow, the Burns District Manager. The letter complained of various management deficiencies including favoritism and promotions based on personal friendship. In his letter plaintiff also reported the destruction and falsification of security records and reports.[3]

13.) On Monday, November 2, 1981, Zastrow received a telephone call from CPC indicating they had received their copy of plaintiff's letter. Burns and CPC were very concerned about the letter and viewed it as a serious matter.[4] Later the same day

---

**3.** Attached to the letter was a copy of a notice of the Whistleblowers' Act that plaintiff had obtained from a CPC bulletin board at the Midland site. On this notice plaintiff wrote "In writing this letter to all recipients, I am claiming protection under the 'Whistleblowers' Protection Act!'"

**4.** At least by May of 1980, CPC had indicated to Burns that it was dissatisfied with their performance at the Midland site. Captain Bradshaw testified that he had been assigned to the Midland site because of "contract problems," and that Burns had been under continuing pressure from CPC to strictly follow procedures. Much of this concern was undoubtedly caused by the highly competitive nature of the security industry.

Burns received its copy of plaintiff's letter to the NLRB.

14.) After talking with CPC, Zastrow assigned Lowell Wilds, Burns' nuclear operations manager, to investigate plaintiff's NLRB letter. In the early afternoon of November 2, Wilds called Captain Bradshaw and advised him that he had been assigned to investigate the letter. In the course of this conversation Captain Bradshaw informed Wilds of his discussion with plaintiff on October 25, and plaintiff's request for demotion on October 26. Wilds instructed Captain Bradshaw not to take any action regarding the letter of reference or sleeping incident pending Wilds' investigation of the NLRB letter.

15.) In regard to finding of fact number fourteen, the Court notes that during trial Wilds testified concerning the precise time of day he contacted Bradshaw to inform him that Burns had received the letter. Specifically, Wilds recalled that he telephoned Bradshaw at about 2:00 p.m. on November 2, 1981.

In a document submitted by Burns (DX 22), it appears that at approximately 1:18 p.m. on November 2, 1981, Captain Bradshaw began his investigation of the sleeping incident. Based on Wilds' testimony and the document admitted in evidence, the defendant contends that when plaintiff's NLRB letter was received, he was already under investigation to determine if he lied to Captain Bradshaw about the sleeping incident.

However, in view of the amount of time between the day of the phone call and trial (approximately 16 months), and having had an opportunity to observe the witness' demeanor on the stand and considering the witness' relation to the defendant, the Court attaches little weight to Wilds' testimony concerning the exact time he telephoned Captain Bradshaw. In weighing this testimony the Court has endeavored to

determine the facts and inferences representing the more probable course of events. As indicated in finding of fact number fourteen, the Court believes that Wilds' telephone call was placed in the early afternoon, at or about the same time Captain Bradshaw began investigating the sleeping incident.[5]

16.) Wilds arrived at the Midland site on November 4, 1981, and began his investigation of the allegations made by plaintiff in his letter. Wilds interviewed the plaintiff, Captain Bradshaw, and several other Burns employees, as well as representatives of CPC.

17.) At the conclusion of his interviews, Wilds concluded that there was no substance to the allegations made in the NLRB letter.

18.) During his investigation of November 4, Wilds directed Captain Bradshaw to obtain reports from the alleged sleeping sergeant and the guard that was with the plaintiff when he allegedly observed the sleeping incident. Wilds also obtained a copy of the reference letter written by plaintiff.

19.) The following day, November 5, 1981, plaintiff was ordered to report to work early. Wilds met with plaintiff and explained why the allegations contained in his NLRB letter were false and then confronted plaintiff with the letter of reference and reports concerning the sleeping incident.

20.) At the conclusion of this interview, Wilds wrote "terminated" on his note pad and left the room. A few minutes later Captain Bradshaw entered the room and informed plaintiff that he was being fired for lying and below standard performance.

21.) The Court believes that when plaintiff wrote the NLRB letter he held an actual, subjective belief that the destruction or falsification of security reports and records at a nuclear power facility is a

---

**5.** Captain Bradshaw testified that the reason he did not begin investigating the reference letter and sleeping incident until November 2, 1981, was because he had been on vacation since October 20. However, despite his vacation Cap-

tain Bradshaw admitted to being present and working at the Midland site on at least two occasions—the evening of October 25 and on November 1.

violation of a state or federal law, regulation or rule.

22.) At the time of his discharge, plaintiff was compensated at the rate of $7.20 per hour and worked 40 hours per week.

23.) Plaintiff is a citizen of the State of Michigan.

24.) Defendant Burns is a Delaware corporation with its principal place of business in the State of New York.

## CONCLUSIONS OF LAW

1.) The Court has jurisdiction of this case pursuant to 28 U.S.C. § 1332.

2.) The Court notes initially that since this is a diversity action, *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), and its progeny mandate that this Court apply the law of Michigan to all substantive questions raised.

3.) With the Findings of Fact in mind, the Court now turns to an analysis of the legal standards under which plaintiff's allegations of retaliatory discharge may be evaluated. The Court's analysis will first identify and discuss the legal standards, including the appropriate burden of proof, applicable to a claim brought under the Michigan Whistleblowers' Protection Act; the Court will then consider whether plaintiff has met his burden of proof and if so, what damages are available and appropriate.

4.) As we have seen, plaintiff claims that his discharge was in retaliation for writing a letter that revealed suspected violations of laws and/or regulations by his employer, Burns Security. In *Suchodolski v. Michigan Consolidated Gas Company*, 412 Mich. 692, 695, 316 N.W.2d 710 (1982), the Michigan Supreme Court recognized that while generally "either party to an employment contract for an indefinite term may terminate it at any time for any, or no, reason" (citing *Toussaint v. Blue Cross & Blue Shield of Michigan*, 408 Mich. 579, 292 N.W.2d 880 (1980)), "some grounds for discharging an employee are so contrary to public policy as to be actionable."

For instance, Michigan courts have prohibited retaliatory discharges when the reason for the discharge was the employee's exercise of a well-recognized statutorily created right. *Sventko v. Kroger Co.*, 69 Mich.App. 644, 245 N.W.2d 151 (1976) (discharge in retaliation for filing a worker's compensation claim.) Similarly, Michigan has implied a cause of action for wrongful termination where the alleged reason for the discharge was the employee's refusal to violate a law. *Trombetta v. Detroit, Toledo, & Ironton Ry. Co.*, 81 Mich.App. 489, 265 N.W.2d 385 (1978) (discharge in retaliation for refusing to falsify pollution control reports.)

Acknowledging the importance of these judicially-carved public policy exceptions to the employment-at-will doctrine, the *Suchodolski* Court noted that most often these proscriptions are found in explicit legislative statements prohibiting the discharge of an employee for acting pursuant to a statutory right or duty. The Michigan Whistleblowers' Protection Act, M.C.L. § 15.361 *et seq.* (hereinafter "the Whistleblowers' Act" or "the Act") represents one of Michigan's "legislative statements" referred to in *Suchodolski*. In essence, the Act is a statutory recognition that the protection of employees who report violations of laws, regulations, and rules is a part of Michigan public policy.

5.) The Act provides that,

An employer shall not discharge, threaten, or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because the employee, or a person acting on behalf of the employee, reports or is about to report, verbally, or in writing, a violation or a suspected violation of a law or regulation or rule promulgated pursuant to law of this state, a political subdivision of this state, or the United States to a public body, unless the employee knows that the report is false, or because an employee is requested by a public body to participate in an investigation,

hearing, or inquiry held by that public body, or a court action. M.C.L. § 15.362 Although the Act became effective March 31, 1981, the Court's research has failed to disclose any Michigan case law construing the Act and its protections.

6.) There is, however, an analogous state statute providing similar protection against retaliatory discharges to employees who file complaints with the Michigan Civil Rights Commission. Enacted as a part of Michigan's Elliott-Larsen Civil Rights Act, the statute provides that an employer shall not "retaliate or discriminate against" an employee that has "made a charge, filed a complaint, testified, assisted or participated in an investigation, proceeding or hearing under this act." M.C.L. § 37.2701.

In interpreting claims of employment discrimination under the Elliott-Larsen Civil Rights Act, Michigan courts have looked to federal decisions construing parallel provisions of Federal legislation, specifically the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. (hereinafter "Title VII"). In *Michigan Civil Rights Commission* ex. rel. *Boyd v. Chrysler*, 80 Mich.App. 368, 263 N.W.2d 376 (1977), the Michigan Court of Appeals remarked that:

> the federal courts have had a much greater opportunity to review questions dealing with ... discrimination in employment than have the state courts. We believe that federal precedent, although not binding, is persuasive in determining what the substantive law of [employment discrimination] is at the present time.

See also *Jones v. Cassen Transport*, 538 F.Supp. 929 (E.D.Mich.1982).

■ In view of the lack of guidance from Michigan courts in the area of retaliatory discharges, and since the federal courts have had occasion to construe § 704(a) of Title VII which, similar to § 701 of the Elliott-Larsen Civil Rights Act, prevents an employer from retaliating against an employee for filing a charge or participating in proceedings before the Equal Employment Opportunity Commission, the Court believes it must look to federal court decisions and precedents for the proper legal standard to apply to plaintiff's claim under the Whistleblowers' Act. There are, of course, some differences between § 704(a) of Title VII and the Act. Section 704(a) is a narrowly drawn provision relating "solely to discrimination against an applicant or employee on account of his participation in legitimate civil rights activities or protests." *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). The Whistleblowers' Act on the other hand, enlarges the scope of protected activity to include the reporting of violations or suspected violations of *any* law, regulation or rule of the State of Michigan or the United States. The Act also permits recovery of certain damages not available under Title VII.

Despite the extended reach of the Act, it shares the goals of § 704(a) in that it seeks to protect the integrity of the law by removing barriers to employee efforts to report violations of the law. The common purpose and design of the statutes permit and perhaps require this Court to look to federal case law for the appropriate legal standards. See *Stafford v. International Harvester Co.*, 668 F.2d 142 (2nd Cir.1981).

■ 7.) In a case of alleged retaliatory discharge the order and allocation of the burden of going forward parallels the allocation first enunciated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and refined in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). See *Cohen v. Fred Meyer Inc.*, 686 F.2d 793 (9th Cir.1982).

In *Burdine, supra*, the Supreme Court defined the parties' respective burdens as follows:

> First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection."

[McDonnell Douglas, 411 U.S.] at 802 [93 S.Ct. at 1824].

Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination. Id., at 804, 93 S.Ct. at 1825.

8.) In establishing a prima facie case of retaliation, a plaintiff must demonstrate three elements:

1.) That the plaintiff engaged in protected activity as defined by the Act;

2.) That the plaintiff was subsequently discharged from employment; and

3.) That there is a causal connection between the protected activity and the discharge.

*Canino v. EEOC*, 707 F.2d 468, 471 (11th Cir.1983), *Cohen v. Fred Meyer Inc.*, 686 F.2d 793, 796 (9th Cir.1982), *Burrus v. United Telephone Co. of Kansas Inc.*, 683 F.2d 339, 343 (10th Cir.1982), *Womack v. Munson*, 619 F.2d 1292, 1296 (8th Cir.1980).

9.) There are some courts that have stated the elements of plaintiff's prima facie case as follows;

1.) participation in protected activity;

2.) that the employer knew of this protected activity;

3.) that plaintiff was subsequently discharged or subjected to other damages; and

4.) that the employer had a retaliatory motive or that the timing of its action was such as to allow an inference of retaliation to arise.

*Brown v. ASD Computing Center*, 519 F.Supp. 1096, 1114–15 (S.D.Ohio 1981), *Sutton v. National Distillers Products Co.*, 445 F.Supp. 1319, 1325–26 (S.D.Ohio 1978), *aff'd.* 628 F.2d 936 (6th Cir.1980).

■ By stating the elements of plaintiff's prima facie case in four parts, these courts have seemingly stiffened plaintiff's burden by requiring a showing that the employer knew of the protected activity and reacted with a retaliatory motive. This apparent difference, however, is somewhat illusory and misleading. In adopting the three-part test of a plaintiff's prima facie case, the majority of courts have recognized that in a retaliation case, the element of causation must be shown. Unlike the more common failure to hire cases, wherein causation is inferred upon a showing that a qualified member of a protected class was not hired and that the employer continued to seek persons of his or her qualifications, a whistleblowing plaintiff must demonstrate that his discharge was caused by his participation in protected activities.

■ With this in mind, it becomes clear that the additional element set forth by some courts *i.e.* that the employer knew of the protected activity, is simply a factor to consider in determining the principal question of causation. Thus the Court believes the three part prima facie case more clearly and precisely establishes a plaintiff's initial burden in a claim brought under the Whistleblowers' Act.

10.) If a plaintiff should establish the three elements of his prima facie case, then the burden of production shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse action. The defendant need not prove "absence of retaliatory motive, but only produce evidence that would dispel the inference of retaliation by establishing the existence of a legitimate reason." *Womack v. Munson*, 619 F.2d at 1296.

11.) If the defendant comes forward with a legitimate reason, the plaintiff may still prevail in a Whistleblowers' action if he demonstrates that the legitimate reason was a mere pretext for the retaliatory action. The overall burden of persuasion remains of course, with the plaintiff.

12.) When and if the pretext stage of the analysis is reached, the question of mixed-motive discharge, *i.e.* retaliation plus a legitimate business reason, must be considered. The more difficult question concerns the appropriate standard to apply in deciding whether the mixed-motive dis-

charge violates the Act. Four possible standards may apply,

1.) whether participation in activity protected by the Act played any part in the discharge, no matter how remote,
2.) whether plaintiff's protected activity played a substantial factor in the discharge,
3.) whether plaintiff's protected activity was the principal, but not sole reason for the discharge, or
4.) whether the discharge would have occurred had there been no protected activity.

*Sutton v. National Distillers*, 445 F.Supp. at 1328.

■ The Court believes that in the context of a claim for retaliatory discharge, a plaintiff retains the ultimate burden of proving that the discharge would not have occurred had there been no protected activity. *Id. See also Mt. Healthy City Board of Education v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977) (holding that the controlling question in retaliation cases is whether the employer would have reached the same decision "even in the absence of the protected conduct.") Applying this standard to plaintiff's claim under the Whistleblowers' Act, and presuming the Court's analysis reaches the pretext stage, it is apparent that plaintiff would have to prove that "but for" his NLRB letter, which is allegedly protected activity under the Act, he would not have been discharged. This standard is plainly correct, as it does not preclude a finding of a Whistleblowers' Act violation when an employer acts from mixed motives. The mere production, by defendant, of a legitimate business reason underlying the discharge will not sterilize unlawful retaliation, where the latter is the controlling factor.

13.) We now turn to the first element of plaintiff's prima facie case, *i.e.* whether plaintiff engaged in protected activity. The Act provides that "An employer shall not discharge ... an employee ... because the employee reports ... a violation or a suspected violation of a law or regulation or rule [of this state or the United States] to a public body, unless the employee knows that the report is false." Since plaintiff introduced no evidence that the destruction or falsification of security records at a nuclear power facility is actually a violation of any state or federal law, rule or regulation, the Court must determine if plaintiff's letter reports a "suspected violation."

■ The Court believes it is realistic to conclude that the Michigan legislature, by using the term "suspected violations," meant to bring within the Act's protections an employee's subjective good faith belief that he was reporting a violation of the law. This interpretation is supported by the language of the Act itself.

The Act's protections are extended beyond the reporting of actual violations by the clause "suspected violations." This is clearly consistent with the purpose of the Act to permit and perhaps encourage employees to report violations of the law without retaliation, which would be thwarted if an employee could only report violations on peril of reprisal if it is ultimately shown that the employer did not violate any laws, rules or regulations. The Act goes on, however, to limit the Act's protection by excluding from its coverage reports that "the employee knows ... is false." Thus the legislature recognized that employees must not be permitted to use the statute in a purely offensive manner by reporting violations known to be false. By precluding protection to those acting in bad faith, the legislature clearly implied that only those acting in good faith are entitled to protection.

■ In applying the Act as interpreted, the Court must determine if a Whistleblowing plaintiff held a subjective good faith belief that his employer had violated the law. In view of the pervasive regulation of the nuclear power industry by a host of state and federal agencies the Court feels that it is eminently reasonable to believe that the destruction and/or falsification of reports and records by the se-

curity force would constitute a violation of a law, rule or regulation. Thus, in the present case the Court has found that plaintiff did hold a subjective belief that the destruction or falsification of security records and reports is a violation of a state or federal law, regulation or rule. (Finding of Fact number 23) Accordingly, the Court believes plaintiff has established the first element of his prima facie case. There is also no doubt that plaintiff was discharged. Therefore, plaintiff has established the second element of his prima facie case.

14.) Before proceeding to the third element, the Court observes that the holding in this case extends only to the reported falsification and destruction of reports. Most of plaintiff's remaining allegations concern management practices of the Company which would not support an action for retaliatory discharge either under the Act or Michigan common law. *Suchodolski v. Michigan Consolidated Gas Co.*, 412 Mich. 692, 316 N.W.2d 710 (1982).

15.) Addressing the element of causation, the Court believes that plaintiff has established that a motivating factor in his discharge was the letter to the NLRB. There are two factors that establish the causal link. First, Burns became aware of the letter in the afternoon of November 2, 1981, and plaintiff was discharged on November 5, 1981. The timing of Burns' action is itself sufficient to allow an inference of retaliation to arise. *See Womack v. Munson*, (suspension within five days, discharge within twenty days of protected activity sufficient to establish prima facie case), *McCarthy v. Cortland County Community Action Program*, 487 F.Supp. 333 (S.D.N.Y.1980) (discharge within two weeks of protected activity held sufficient to establish prima facie case.) Second, Burns' investigation of plaintiff's alleged performance deficiencies began at or about the same time plaintiff's NLRB letter arrived at the Company's regional office. This fact provides persuasive support for plaintiff's claim of retaliatory discharge, and in conjunction with the timing of his discharge establishes the final element of his prima facie case.

16.) The Company alleges however, that plaintiff was discharged for "Lying—presenting falsehoods to management and below standard performance." Prior to the alleged incidents involving the sleeping sergeant and letter of reference, plaintiff had indeed been advised that his work performance was inadequate in certain areas. (See findings of fact number three and four.) Captain Bradshaw testified at trial, however, that plaintiff's prior inadequacies were not relevant to his termination. He stated that the reference letter and lying were the actual reasons for the discharge.

17.) Presuming that plaintiff lied to Captain Bradshaw about the sleeping incident and reference letter, the Company would have established a legitimate business reason for firing plaintiff. However, as previously indicated, such a determination is not necessary in the present case because the Court believes that even if plaintiff did act as alleged, the Company's stated reasons are a pretext for their retaliatory action.

18.) The pretextual nature of the Company's actions is demonstrated most aptly by the delay in commencing the investigation of plaintiff's alleged lying and letter of reference. Although Captain Bradshaw was aware of the reference letter as early as October 16 and no later than October 19, he did not attempt to investigate the matter or even confront plaintiff with the allegation until the evening of October 25, and then only after plaintiff had approached Bradshaw with a request to speak to him. As to the alleged lying incident, Bradshaw again took no action until the early afternoon of November 2, about the same time that the Company received the NLRB letter.

These delays in investigating plaintiff were attributed to Bradshaw's absence during the week in question. However, as previously noted, Bradshaw was at work at least two days during his vacation. Furthermore, it is crucial to note that the allegations against plaintiff were very serious, according to the Company. Plaintiff's actions constituted infractions that upon in-

vestigation required immediate discharge. These were matters, again according to the Company, that did not warrant a suspension, or even demotion, but that mandated immediate termination.

It seems somewhat anomolous to the Court, that when faced with allegations of such magnitude, Captain Bradshaw would not act until the early afternoon of November 2, about the same time plaintiff's NLRB letter arrived at the Company. Additionally, the Company did not, upon learning of plaintiff's allegedly improper acts, suspend plaintiff pending an investigation, which was an option always available to the Company.

19.) Based on the above analysis, the Court finds that plaintiff has shown that but for his participation in activities protected by the Act, he would not have been discharged. We turn now to an analysis of available and appropriate damages.

20.) The Act provides that "A Court ... shall order, as the Court considers appropriate,

> reinstatement of the employee, the payment of back wages, full reinstatement of fringe benefits and seniority rights, actual damages, or any combination of these remedies. A Court may also award the complainant all or a portion of the costs of litigation, including reasonable attorney fees and witness fees, if the court determines that the award is appropriate." M.C.L. § 15.364

21.) Plaintiff has requested reinstatement, back pay including vacation benefits, and damages for emotional distress and humiliation. Plaintiff is also seeking approximately $1,000.00, representing the difference between the fair market value and sales price of plaintiff's motorcycle, which plaintiff claims he was forced to sell after his discharge.

■ For the reasons set forth below, the Court feels that damages should be limited to an award of back pay including vacation benefits. The Court does not believe that reinstatement or other damages requested by plaintiff are appropriate.

22.) In determining plaintiff's award of back pay, the Court has considered plaintiff's hourly rate of $7.20 and average work week of forty hours. The Company argues that this is improper in light of plaintiff's request for a demotion to guard or sergeant. Apparently the Company believes that any back pay award should reflect the lower hourly rate for a guard or sergeant. However, the Company produced no evidence indicating that at the time of plaintiff's discharge he had actually been demoted or was even considered as a candidate for demotion. To base an award of back pay on a guard or sergeant's pay rate would require the Court to engage in pure conjecture as to plaintiff's fate with the Company had he not been discharged. The Court refuses to so speculate.

Thus, plaintiff is entitled to $33,177.60 in back pay, computed by multiplying plaintiff's daily wage of $57.60 by the number of days between November 5, 1981, and the date of this order.

23.) The Act clearly authorizes the award of plaintiff's remaining damage requests, including reinstatement and actual damages. In a fashion similar to § 706(g) of Title VII, the Act recognizes however, that damages must be shaped to the particular facts of a case. The Act states that the Court "shall order [damages] as the court considers appropriate."

The Sixth Circuit has held that the award of affirmative relief "should rest within the sound discretion of the trial judge." *Head v. Timken Roller Bearing*, 486 F.2d 870 (6th Cir.1973), *Thornton v. East Texas Motor Freight*, 497 F.2d 416 (6th Cir.1974). *See also Franks v. Bowman Transportation Co.*, 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976).

24.) In exercising discretion to determine the "appropriate" relief in the present case, the Court is guided by the objectives sought to be accomplished by the Act. As previously stated, the Act is a remedial measure designed to protect employees that report violations or suspected violations of the law. In the present case the Company clearly acted in a manner incon-

sistent with the purpose of the Act, and accordingly plaintiff is entitled to relief.

However, there are factors present in this case that support the denial of certain aspects of relief. The Company introduced evidence tending to support a finding that plaintiff may have acted *in part* with an improper motive. Although the plaintiff held a subjective good faith belief that the Company had violated the law, it remains that on October 25, 1981, plaintiff had expressed apprehension concerning his job security. His immediate request for a demotion to a union position protected by the grievance procedure, along with his express pronouncement of an intent to seek protection from the Act casts some doubt on plaintiff's motivation in reporting the violation. These peculiar facts persuade the Court that the appropriate relief in this case is limited to an award of back pay.

It should be emphasized that the tailoring of damages to reach a just result merely reflects the Court's belief that the Company's violation of the Act overshadows by far any questionable motives by plaintiff. Additionally, the Court is persuaded that denying certain aspects of relief will not frustrate the purpose of the Act.

25.) No attorney fees are awarded.

## CONCLUSION

For the reasons stated herein, the Court DIRECTS the Clerk to enter a judgment for plaintiff in the amount of $33,177.60, with costs and interest.

IT IS SO ORDERED.